### UNITED STATES v. PETRILLO.
### No. 46 CR 357.

District Court, N. D. Illinois, E. D.
Jan. 14, 1948.

See also 67 S.Ct. 1538.

Otto Kerner, U. S. Atty., of Chicago, Ill., for the Government.

Daniel D. Carmell, of Chicago, Ill., for defendant.

LA BUY, District Judge.

The amended information in this case charges the defendant, James C. Petrillo, President of the Chicago Federation of Musicians, Local No. 10 of the American Federation of Musicians, and President of the American Federation of Musicians, with violation of Section 506(a) (1) of the Communications Act, 47 U.S.C.A., § 506(a) (1), which reads as follows:

"(a) It shall be unlawful, by the use or express or implied threat of the use of force, violence, intimidation, or duress, or by the use or express or implied threat of the use of other means, to coerce, compel or constrain or attempt to coerce, compel, or constrain a licensee—

"(1) to employ or agree to employ, in connection with the conduct of the broadcasting business of such licensee, any person or persons in excess of the number of employees needed by such licensee to perform actual services; * * *."

Radio station WAAF, the licensee, is owned and operated by the Drovers Journal Publishing Company. The evidence shows that 90% of the station's musical program is consumed in playing records and electrical transcriptions. In May 1946 WAAF had in its employ three members of the Chicago Federation of Musicians who performed services as record librarians although the individual contracts of two stated one was a mechanical musical device operator and the other a mechanical musical device operator and pianist. The testimony shows that the three record librarians were a sufficient number to handle all the records of station WAAF and that none of them actually performed any service as record turners. There was no contract between station WAAF and the American Federation of Musicians or any Local thereof in May 1946.

The chain of events concerning the alleged violation commenced on May 11, 1946, when defendant as president of the Local addressed the following letter to station WAAF:

"Inasmuch as our agreement concerning wage scales, rules and regulations for broadcasting over your station has expired, the following are the changes and revisions requested by the Chicago Federation of Musicians to cover a new agreement:

"(1) New agreement to be for a period commencing May 20, 1946, and terminating February 1, 1947;

"(2) Three (3) extra musicians shall be employed as staff musicians, making the total number of musicians employed, six (6);

"(3) The record turners shall turn records exclusively and shall not be required to perform as instrumentalists.

"All other conditions now in force and effect as relating to local broadcasting stations, as stipulated in Section 7 of Section 29 of the by-laws of the Chicago Federation of Musicians, known as Radio Wage Scales, Rules and Regulations, (a copy of which is attached hereto) shall remain in force and effect during the term of this agreement, except as herein altered, revised, or amended.

"Kindly advise whether the foregoing proposals are acceptable to you."

Following receipt of the letter, May 18th, Mr. Eidman, station manager of WAAF, and Mr. Hutchinson, secretary-treasurer of the Drovers Journal, consulted with their attorneys and decided to reject the demands of the defendant for the employment of additional musicians. Although Mr. Hutchinson was present at the conference held in the office of their attorneys when this decision was made, a letter was sent to defendant stating that Mr. Hutchinson was ill and upon his return the matter would be taken up with defendant. Subsequently several telephone calls were made by defendant to counsel for WAAF wherein defendant was told a meeting was desired to discuss the demand and that the request was manifestly unfair in view of the fact that another station larger than WAAF employed less musicians. Defendant stated he didn't believe a meeting was necessary that all he wanted was an indication the station would accept his demands for six musicians, that he was on vacation for the first time in five years, was further committed to a meeting of the International at St. Petersburg, Florida, that the situation of the other station would be taken care of when its contract expired, and that station WAAF "had been getting away with murder for a long time." Mr. Schulman, the attorney with whom defendant spoke, testified defendant then said to him that during all their conversations together, no counter-offer had been submitted, that Mr. Schulman told defendant he would recommend to the station they employ one additional musician, that this proposal was not acceptable to the defendant since defendant had learned station WAAF had been making "an awful lot of money during the last two or three years" and had not granted wage increases for approximately a year and a half. Defendant then said unless he heard from Mr. Schulman by May 25th he would take action, whereupon Mr. Schulman advised that his demands could not be accepted and if by his statement defendant meant a strike no action would be taken under threat of a strike. Whereupon defendant replied, "Will you please consult with your people and let me know what your position will be tomorrow morning? I will call you at that time." When the defendant called the following day Mr. Schulman told him he had discussed the matter with his partner, that his partner was reasonably confident the station would accept one additional musician, and a meeting should be arranged between defendant and the principals of the radio station and their counsel. Defendant advised that he would consider this, and would give his answer the following Monday directly or indirectly.

On May 27th, the following Monday, station WAAF received a telegram from defendant stating he had no alternative in view of the inability to come to an agreement but to withdraw the services of the musicians then employed by the station. On the same day the three union employees received wires from defendant telling them that since no agreement could be consummated with their employer they were to perform their last service Monday, May 27th. On May 27th station WAAF through its counsel wired defendant that repeated requests had been made for a meeting, that defendant repeatedly refused to consider any adjustment except on his own basis, and they were still willing to meet at defendant's convenience. On May 28th defendant wired a reply: " * * * So there will be no misunderstanding, I have always supported collective bargaining but when a contract expires as far back as February 15, 1944, and then I approach the station by sending a letter on May 11, 1946, wherein I asked for six men to be employed on the station instead of three, I am then told that the station manager is sick and that the matter is delayed. When the station finally contacted me I was forced to negotiate with a man who knows nothing about the business and after several discussions

he refused to agree to engage six musicians. I had no alternative except to withdraw the musicians. I am ready and willing to continue negotiations but inasmuch as I am departing tomorrow morning for the convention of the American Federation of Musicians in St. Petersburg, Florida, same will have to be delayed until my return in about ten days."

Subsequent to the withdrawal of the services of the union employees, all discussions between the representatives of the station and the defendant ceased. The three employees have not returned to work and have not been replaced; the services formerly rendered being assumed by other employees.

Richard V. Gilbert, a consulting economist, testified he made an intensive study of the radio industry and particularly the regulations and reports of the Federal Communications Commission, which Commission grants licenses to radio stations. His studies showed that the standards and principles established by the rules and regulations of the Commission in relation to radio stations indicate that the monopolistic licenses granted radio stations, protecting them against competition which is normal in other fields, is granted in return for their responsibility to serve the public interest. Among those responsibilities is the duty to provide the listening public with an opportunity to hear live musicians as distinguished from what is known as "canned" music, and the duty to provide an opportunity for gainful employment of musicians. Federal Communications Commission Rule 176, considered by the Senate Subcommittee during the hearings on the amendment to the Communications Act reads: "There is no doubt that the listeners' interest is enhanced by the knowledge that the artist is performing simultaneously with the reception in the home. Likewise, it is most important to guarantee the continuance of such appearances both from the standpoint of the public and from the standpoint of continuing the gainful employment of the artists who have contributed so much to the art of broadcasting. Indeed, radio broadcasting would lose much of its appeal to the public if the rendition of live talent programs is in any way curbed."

At page 39 of the Report of the Federal Communications Commission entitled "Public Service Responsibility of Broadcast Licensees" published in March 1946, it was disclosed that the average station employed less than one-third of a full time musician, and the Commission concluded: "Such figures suggest, particularly at the local station level, that few stations are staffed adequately to meet their responsibilities in serving the community. A positive responsibility rests upon local stations to make articulate the voice of the community. Unless time is earmarked for such a purpose, unless talent is positively sought and given at least some degree of expert assistance, radio stations have abdicated their local responsibilities and have become mere common carriers of program material piped in from outside the community."

The publication cites numerous examples to show that in passing on applications for licenses the Commission takes into account the promises to abide by this responsibility. The Commission also reported that most stations are financially able to employ far larger program staffs than at present. Mr. Gilbert testified that his investigation and studies revealed that of 12,000 musicians in the Chicago area only 4,000 enjoyed full time employment. It was his deduction from the studies made that, in the light of the enormous expansion of the broadcasting business and its enormous earnings, which he stated were without parallel in our financial experience, it is the responsibility and duty of those receiving licenses to serve the public interest by promoting the culture and art of music and to provide opportunities of employment of live musicians. In answer to a hypothetical question, Mr. Gilbert stated that the minimum number of musicians needed for station WAAF would be an increase of three musicians to produce live music over that station.

A study of the legislative history of Section 506 shows that Congress intended this law to prohibit union leaders from attempting to compel broadcasters to pay unions, their representatives, or members

sums of money equal to or greater than the sums required to pay unneeded employees. Throughout the discussions and debates preceding the enactment of this law constant reference was made to the need to put an end to extortions, exactions, tributes and coercive demands to pay for unused or stand-by musicians in relation to broadcasting stations.

The evidence shows that the contract between the union and the station expired in 1944. The individual contracts between the station and the union members were in effect at the time their services were withdrawn and contained the following clause: "It is agreed that all rules, laws and regulations of the American Federation of Musicians, and all the rules, laws and regulations of the local in whose jurisdiction the musicians perform, in so far as they are not in conflict with the Federation, are made a part of this contract."

The constitution and by-laws of the American Federation of Musicians and Local No. 10 authorized the president of the union, the defendant herein, to withdraw the services of union members when in his judgment it was necessary to do so to conserve and safeguard the best interests of the Federation, the Locals, or its members. The right of the defendant to withdraw the services of these union members under the individual contracts of employment is sanctioned by Subsection (c) of Section 506, which reads: "The provisions of subsection (a) or (b) of this section shall not be held to make unlawful the enforcement or attempted enforcement, by means lawfully employed, of any contract right heretofore or hereafter existing or of any legal obligation heretofore or hereafter incurred or assumed."

The individual contracts of employment were in existence at the time of the enactment of Section 506 of the Communications Act and the rights existing under those contracts were preserved and protected by this subsection.

Do the facts and circumstances of this case constitute an attempt in good faith on the part of the bargaining representative of the union to obtain honest employment for additional musicians? Or, do the actions of the defendant establish "union racketeering", "featherbedding", or an attempt through threats of the use of force, intimidation, or duress to compel the hiring of persons in excess of the number of employees needed, knowing that they were not needed by such licensee, to perform actual services?

The defendant's letter which precipitated the controversy directed attention to the expired contract and requested that the new agreement provide for "three extra musicians who shall be employed as staff musicians." In the absence of any evidence to the contrary, this request can only be interpreted to mean that it was the intention of the defendant that these additional musicians were to perform actual services. During all subsequent negotiations the defendant consistently demanded employment for three additional musicians and the record is completely devoid of any evidence indicative of any intention or intimation on the part of the defendant that these three additional musicians were not to perform actual services. The demand for the employment of additional employees was unaccompanied by threats of the use of force, violence, intimidation or duress. This fact is further emphasized in the light of the testimony of the representatives of the station, that neither the operation of the station nor its employees were interfered with, and that they were not even inconvenienced by reason of the dispute. The evidence further shows that in all previous negotiations between the station and the defendant their relationship was cordial and cooperative.

■ The amended information charges that defendant "knowing that the licensee had no need for the services of additional employees" did commit the acts complained of. This allegation is an essential element of the offense charged and must be proven beyond a reasonable doubt.

■ Before his arrest defendant was reported to have said he was purposely violating the Lea Act to test its constitutionality, that he believed the law was unconstitutional and was so advised by his counsel. Defendant's conclusion that his actions in this case constituted a violation of the law, or that the law was unconstitutional, is not determinative of his guilt or of the law's unconstitutionality any more

than would have been his conclusion that he had not violated the law if, in fact, his actions constituted a violation.

From the evidence presented during the trial the court is of the opinion that three additional musicians were not needed by the station under its program of using records and transcriptions during 90% of its time. But, is there any evidence in the record which shows that defendant had knowledge or information of, or was advised of the lack of need for additional employees either at the time of the request made in his original letter of May 11, 1946, or at any time during the entire period of negotiations? Nothing contained in the letters and telegrams between defendant and the representatives of the station disclosed to defendant the lack of need for additional employees as a reason for rejecting the defendant's demands. Neither does the testimony in this case show that the defendant had knowledge of or was told that the station had no need for additional employees. There is no evidence whatever in the record to show that defendant had knowledge of or was informed of the lack of need for additional employees prior to the trial of this case.

For the reasons above stated the court is of the opinion that the prosecution has failed to prove the defendant guilty of the violation charged.