**GAMBLE ENTERPRISES, Inc. v. NATIONAL LABOR RELATIONS BOARD et al.**

No. 11405.

United States Court of Appeals Sixth Circuit.

May 9, 1952.

Frank C. Heath, Cleveland, Ohio, Frank C. Heath, Edward E. Rigney, and Bayless A. Manning, all of Cleveland, Ohio, on brief; Jones, Day, Cockley & Reavis, Cleveland, Ohio, of counsel, for petitioner.

Bernard Dunau, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Bernard Dunau and Alice Andrews, all of Washington, D. C., on brief, for respondent.

Henry Kaiser, Washington, D. C., for intervenor.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

SIMONS, Chief Judge.

The appeal requires interpretation and applicability of § 8(b)(6) of the Labor Management Relations Act of 1947, 61 Stat. 140, 29 U.S.C. § 158(b)(6), the Taft-Hartley Act. The petitioner, a corporation operating a chain of theatres in several states, including the Palace Theatre at Akron, Ohio, filed a charge of unfair labor practices against Local No. 24 of the American Federation of Musicians. The general counsel of the Board issued a complaint which the Board dismissed, one member dissenting. The petitioner seeks reversal of the Board's order.

§ 8(b)(6) provides:

"It shall be an unfair labor practice for a labor organization or its agents * * * to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed."

The facts are not in dispute. Since the decline of vaudeville the policy of the Palace Theatre has been to occasionally present traveling bands of national reputation called "name bands" along with motion pictures. For many years prior to 1947, it paid for a stand-by orchestra composed of nine local musicians whenever a name band was hired to play an engagement. When the Taft-Hartley Act was passed, on June 23, 1947, the Palace refused any longer to pay for a stand-by orchestra and notified the union of its refusal. No objection was made at the time to this policy and no demands were made by the union for employment. Between June 2, 1947 and November 12 of that year, the Palace employed seven name bands without being required to pay for a stand-by orchestra.

In October of 1947, the union demanded that the petitioner hire a local orchestra every time the theatre employed a name band to play overtures, intermissions, and "chasers." Its demand was refused on the ground that the services of the orchestra were not needed, had no drawing power, and interfered with the operation of the theatre. At the time of the union demand the theatre had scheduled a performance by a traveling band for November 20. This band was not permitted to fill its engagement because of § 4 of Art. 18 of the constitution and by-laws of the American Federation of Musicians which prohibits a traveling member of the Federation from performing without the consent of the local, "unless the local house orchestra is also employed." Negotiations between the theatre and the union falling short of agreement need not be detailed. On May 16, 1949, the petitioner filed its unfair labor practice charge, and, on July 26, contracted for the appearance of a traveling orchestra to perform on August 18th, but the orchestra, up-

on being informed by the union that there was no agreement, failed to fill its engagement. Subsequent negotiations again yielded no agreement. On January 3, 1950, the Board issued its complaint; a hearing was held at the close of which the trial examiner, though finding that the union's act fell within § 8(b) (6), recommended dismissal on the ground that the petitioner's contract with the orchestra being expressly subject to the rules and regulations of the union, it and not the acts of the union brought about failure of performance.

The Board affirmed the trial examiner's ruling, but upon the ground that the union's act did not fall within the condemnation of the section because the local orchestra insisted on being permitted to play and, therefore, did nothing more than seek employment, which was outside the coverage of the section.

The controverted section classifies as unfair, labor practices which cause or attempt to cause an employer to pay or deliver money, or things of value, "in the nature of an exaction". The examiner reasoned that the employment of a local orchestra in the pit on occasions when a name band was performing from the stage, which was undesirable from the viewpoint of the theatre management, added nothing of drawing power to its attractions and constituted positive interference with the stage attraction, was not a real service because it afforded no actual consideration for the payment of money. Such proposal, if accompanied by an attempt to cause its effectuation, is in the nature of an exaction from the employer. So, also, was an alternate proposal that the local orchestra be employed for 50% of the total number of engagements of traveling bands, when coupled with the coercive element residing in the fact that lacking consent of the Local, the theatre was unable to secure the services of traveling bands. The Labor Board found the evidence insufficient to sustain these conclusions, or to justify a finding that the union was attempting to cause the theatre to make payments to local musicians for services which were not to be performed. It held it to be perfectly lawful for a labor organization to seek

employment for its members, that § 8(b)(6) was not intended to outlaw such activity, and was framed solely to restrict exactions by labor organizations for services "not performed or not to be performed."

The Board rejected the only reasonable inference to be drawn from undisputed facts. The entire history of the long maintained theatre policy supports the rejected inference. Prior to the enactment of the Taft-Hartley Act, it paid for the time of the union but declined to accept its services. Thereafter, it repeatedly engaged traveling bands without employing the local union. When the demand was made that it do so, the theatre persisted in its policy that it had no need for such services, did not desire them, and that they would be a detriment rather than an advantage to it. The right of an enterprise to frame its own business or entertainment policy when no violation of law may be perceived is indisputable.

The section uses the phrase "for services which are not performed or not to be performed." The union knew the settled policy of the theatre. It acquiesced in it for nearly six months after the effective date of the Taft-Hartley Act. To force the theatre to pay for services not needed, and of detriment to it was clearly an exaction.

By the Board's order, the provisions of § 8(b)(6) may be completely nullified by the mere assertion of the union that it desires to perform. The Board reasoned that this was precisely the object of the section and speculated that the union had modified its earlier policy in order to avoid its violation. We are unable, however, to ascribe to Congress a purpose to condemn certain practices in labor relations and at the same time to use a form of expression that permits escape from its condemnation.

While much subtle interpretation has been applied to the legislative history of the enactment and to the colloquies between Senator Taft and other members of the Senate to sustain the non-applicability of the section to presently challenged practices, it would extend this opinion to undue length to analyze each of the excerpts from the Senate debate presented to us. It is sufficient to say that in the main they demonstrate Senator Taft's effort to convince his colleagues that the section does not reach conventional stand-by practices normally incident to services required by an employer from his employees in the usual course of his business and of benefit to him such as rest periods, lunch periods, relief duty in case of emergency or need, inactive periods during time of machinery repair, and other non-work presence of regular employees upon the employer's premises.

The dominant purpose of § 8(b)(6), however, is illuminated by Senator Taft in 93 Cong. Rec. 6446 where he said of it:

"* * * To make it an unfair labor practice for a man to say you must have ten musicians and if you insist that there is room for only six you must pay the other four anyway, that is in the nature of an exaction from the employer for services which he does not want, does not need, and is not even willing to accept."

The analogy of the example to the presently charged labor practice falls barely short of perfection, and reaches it if we substitute "need" for "room."

No great social or economic good in the field of labor relations invites a strained construction of the challenged section. By its application to a situation clearly within its declared purpose, the field of activity for a small local orchestra may be somewhat curtailed but at the same time the market for the services of much larger musical organizations is greatly enhanced.

Nierotko v. Social Security Board, 6 Cir., 149 F.2d 273, 276, affirmed Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718, is not dispositive of the present controversy. The Nierotko case dealt with the back pay orders of the National Labor Relations Board in determining that such pay constituted "wages" under the Social Security Act. The employees there concerned were the regular employees of the Ford Motor Company, prevented from the pursuit of legally protected organizing and bargaining efforts by the unlawful acts of their employer. The case involved interpretation of the Social Security Act, the preservation of the bene-

64

fits provided by that Act, and incidental to regular employment. Here, the members of the orchestra were not in the employ of the theatre and their services were sought to be imposed upon the employer by practices in the nature of an exaction.

The order of dismissal is set aside and the cause remanded to the National Labor Relations Board for further proceedings not inconsistent herewith.

Reversed.