## AMERICAN NEWSPAPER PUBLISHERS ASSOCIATION *v.* NATIONAL LABOR RELATIONS BOARD.

No. 53.   Argued November 19, 1952.—Decided March 9, 1953.

*Elisha Hanson* argued the cause for petitioner. With him on the brief were *William K. Van Allen* and *Arthur B. Hanson.*

*Bernard Dunau* argued the cause for respondent. With him on the brief were *Acting Solicitor General Stern, George J. Bott, David P. Findling* and *Mozart G. Ratner.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The question here is whether a labor organization engages in an unfair labor practice, within the meaning of § 8 (b) (6) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947,[1] when it insists that newspaper publishers pay printers for reproducing advertising matter for which the publishers ordinarily have no use. For the reasons hereafter stated, we hold that it does not.

Petitioner, American Newspaper Publishers Association, is a New York corporation the membership of which includes more than 800 newspaper publishers. They represent over 90% of the circulation of the daily and Sunday newspapers in the United States and carry over 90% of the advertising published in such papers.

In November, 1947, petitioner filed with the National Labor Relations Board charges that the International

---

[1] "SEC. 8. . . .

    .         .         .         .         .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

    .         .         .         .         .

"(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed. . . ." 61 Stat. 140–142, 29 U. S. C. (Supp. V) § 158 (b) (6).

Typographical Union, here called ITU, and its officers were engaging in unfair labor practices within the meaning of § 8 (b)(1), (2) and (6) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, here called the Taft-Hartley Act.[2] The Regional Director of the Board issued its complaint, including a charge of engaging in an unfair labor practice as defined in § 8 (b)(6), popularly known as the "anti-featherbedding" section of the Act. It is not questioned that the acts complained of affected interstate commerce.

The trial examiner recommended that ITU be ordered to cease and desist from several of its activities but that the "featherbedding" charges under § 8 (b)(6) be dismissed. 86 N. L. R. B. 951, 964, 1024–1033. The Board dismissed those charges. *Id.,* at 951, 963. Petitioner then filed the instant proceeding in the Court of Appeals for the Seventh Circuit seeking review and modification of the Board's orders. That court upheld the Board's dismissal of all charges under § 8 (b)(6). 193 F. 2d 782, 796, 802. See also, 190 F. 2d 45. A comparable view was expressed in *Rabouin* v. *Labor Board,* 195 F. 2d 906, 912–913 (C. A. 2d Cir.), but a contrary view was taken in *Gamble Enterprises* v. *Labor Board,* 196 F. 2d 61 (C. A. 6th Cir.). Because of this claimed conflict upon an important issue of first impression, we granted certiorari in the instant case, 344 U. S. 812,[3] and in *Labor*

---

[2] 49 Stat. 449, 29 U. S. C. § 151 *et seq.,* as amended, 61 Stat. 140–142, 29 U. S. C. (Supp. V) § 158 (b)(1), (2) and (6).

[3] The grant was—

"limited to question No. 2 presented by the petition for the writ, *i. e.:*

"Whether the demand and insistence of the International Typographical Union that publishers pay employees in their composing rooms for setting 'bogus' violated Section 8 (b)(6) of the National Labor Relations Act in view of the fact that composing room employees perform no service incident or essential to the production of a newspaper in their handling of such 'bogused' material."

*Board* v. *Gamble Enterprises,* 344 U. S. 814. Our decision in the *Gamble* case follows this, *post,* p. 117.[4]

Printers in newspaper composing rooms have long sought to retain the opportunity to set up in type as much as possible of whatever is printed by their respective publishers. In 1872, when printers were paid on a piece-work basis, each diversion of composition was at once reflected by a loss in their income. Accordingly, ITU, which had been formed in 1852 from local typographical societies, began its long battle to retain as much type-setting work for printers as possible.

With the introduction of the linotype machine in 1890, the problem took on a new aspect. When a newspaper advertisement was set up in type, it was impressed on a cardboard matrix, or "mat." These mats were used by their makers and also were reproduced and distributed, at little or no cost, to other publishers who used them as molds for metal castings from which to print the same advertisement. This procedure by-passed all compositors except those who made up the original form. Facing this loss of work, ITU secured the agreement of newspaper publishers to permit their respective compositors, at convenient times, to set up duplicate forms for all local advertisements in precisely the same manner as though the mat had not been used. For this reproduction work the printers received their regular pay. The doing of this "made work" came to be known in the trade as "setting bogus." It was a wasteful procedure. Nevertheless, it has become a recognized idiosyncrasy of the trade and a customary feature of the wage structure and work schedule of newspaper printers.

---

[4] For a general discussion of the problems in these cases, see Cox, Some Aspects of the Labor Management Relations Act, 19 \7, 61 Harv. L. Rev. 274, 288–290; Featherbedding and Taft-Hartle\, 52 Col. L. Rev. 1020–1033.

By fitting the "bogus" work into slack periods, the practice interferes little with "live" work. The publishers who set up the original compositions find it advantageous because it burdens their competitors with costs of mat making comparable to their own. Approximate time limits for setting "bogus" usually have been fixed by agreement at from four days to three weeks. On rare occasions the reproduced compositions are used to print the advertisements when rerun, but, ordinarily, they are promptly consigned to the "hell box" and melted down. Live matter has priority over reproduction work but the latter usually takes from 2 to 5% of the printers' time.[5] By 1947, detailed regulations for reproduction work were included in the "General Laws" of ITU. They thus became a standard part of all employment contracts signed by its local unions. The locals were allowed to negotiate as to foreign language publications, time limits for setting "bogus" and exemptions of mats received from commercial compositors or for national advertisements.

Before the enactment of § 8 (b)(6), the legality and enforceability of payment for setting "bogus," agreed to by the publisher, was recognized. Even now the issue before us is not what policy should be adopted by the Nation toward the continuance of this and other forms of featherbedding. The issue here is solely one of statutory

---

[5] In metropolitan areas, only the printers on the "ad side" of a composing room, as contrasted with those on the "news side," take part in the reproduction work and never on a full-time basis. Such work is not done at overtime rates but when there is an accumulation of it, the newspaper is not permitted to reduce its work force or decline to hire suitable extra printers applying for employment. The trial examiner, in the instant case, found that reproduction work at the Rochester Democrat & Chronicle cost over $5,000 a year, at the Chicago Herald-American, about $50,000, and at the New York Times, about $150,000.

interpretation: Has Congress made setting "bogus" an unfair labor practice?

While the language of § 8 (b)(6) is claimed by both sides to be clear, yet the conflict between the views of the Seventh and Sixth Circuits amply justifies our examination of both the language and the legislative history of the section. The section reads:

"Sec. 8. . . .

. . . . .

"(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed. . . ." 61 Stat. 140–142, 29 U. S. C. (Supp. V) § 158 (b)(6).

From the above language and its history, the court below concluded that the insistence by ITU upon securing payment of wages to printers for setting "bogus" was not an unfair labor practice. It found that the practice called for payment only for work which actually was done by employees of the publishers in the course of their employment as distinguished from payment "for services which are not performed or not to be performed." Setting "bogus" was held to be service performed and it remained for the parties to determine its worth to the employer. The Board here contends also that the insistence of ITU and its agents has not been "in the nature of an exaction" and did not "cause or attempt to cause an employer" to pay anything "in the nature of an exaction." Agreement with the position taken by the court

below makes it unnecessary to consider the additional contentions of the Board.

However desirable the elimination of all industrial featherbedding practices may have appeared to Congress, the legislative history of the Taft-Hartley Act demonstrates that when the legislation was put in final form Congress decided to limit the practice but little by law.

A restraining influence throughout this congressional consideration of featherbedding was the fact that the constitutionality of the Lea Act penalizing featherbedding in the broadcasting industry was in litigation. That Act, known also as the Petrillo Act, had been adopted April 16, 1946, as an amendment to the Communications Act of 1934. Its material provisions are stated in the margin.[6] December 2, 1946, the United States District Court for the Northern District of Illinois held that it violated the First, Fifth and Thirteenth Amendments to the Constitution of the United States.

---

[6] "SEC. 506. (a) It shall be unlawful, by the use or express or implied threat of the use of force, violence, intimidation, or duress, or by the use or express or implied threat of the use of other means, to coerce, compel or constrain or attempt to coerce, compel, or constrain a licensee—

"(1) to employ or agree to employ, in connection with the conduct of the broadcasting business of such licensee, any person or persons in excess of the number of employees needed by such licensee to perform actual services; or

"(2) to pay or give or agree to pay or give any money or other thing of value in lieu of giving, or on account of failure to give, employment to any person or persons, in connection with the conduct of the broadcasting business of such licensee, in excess of the number of employees needed by such licensee to perform actual services; or

"(3) to pay or agree to pay more than once for services performed in connection with the conduct of the broadcasting business of such licensee; or

"(4) to pay or give or agree to pay or give any money or other thing of value for services, in connection with the conduct of the

*United States* v. *Petrillo,* 68 F. Supp. 845. The case was pending here on appeal throughout the debate on the Taft-Hartley bill. Not until June 23, 1947, on the day of the passage of the Taft-Hartley bill over the President's veto, was the constitutionality of the Lea Act upheld. *United States* v. *Petrillo,* 332 U. S. 1.[7]

The purpose of the sponsors of the Taft-Hartley bill to avoid the controversial features of the Lea Act is made clear in the written statement which Senator Taft, cosponsor of the bill and Chairman of the Senate Committee on Labor and Public Welfare, caused to be incorporated in the proceedings of the Senate, June 5, 1947. Referring to the substitution of § 8 (b)(6) in place of the detailed featherbedding provisions of the House bill, that statement said:

> "The provisions in the Lea Act from which the House language was taken are now awaiting determination by the Supreme Court, partly because of the problem arising from the term 'in excess of the number of employees reasonably required.' Therefore, the conferees were of the opinion that general legislation on the subject of featherbedding was not

broadcasting business of such licensee, which are not to be performed; . . . .

.      .      .      .      .

"(c) The provisions of subsection (a) or (b) of this section shall not be held to make unlawful the enforcement or attempted enforcement, by means lawfully employed, of any contract right heretofore or hereafter existing or of any legal obligation heretofore or hereafter incurred or assumed.

"(d) Whoever willfully violates any provision of subsection (a) or (b) of this section shall, upon conviction thereof, be punished by imprisonment for not more than one year or by a fine of not more than $1,000, or both. . . ." 60 Stat. 89, 90, 47 U. S. C. § 506 (a) (c)(d).

[7] For a report of the subsequent trial and acquittal on the merits, see *United States* v. *Petrillo,* 75 F. Supp. 176.

warranted at least until the joint study committee proposed by this bill could give full consideration to the matter." 93 Cong. Rec. 6443.[8]

On the same day this was amplified in the Senator's oral statement on the floor of the Senate:

"There is one further provision which may possibly be of interest, which was not in the Senate bill. The House had rather elaborate provisions prohibiting so-called feather-bedding practices and making them unlawful labor practices. The Senate conferees, while not approving of feather-bedding practices, felt that it was impracticable to give to a board or a court the power to say that so many men are all right, and so many men are too many. It would require a practical application of the law by the courts in hundreds of different industries, and a determination of facts which it seemed to me would be almost impossible. So we declined to adopt the provisions which are now in the Petrillo Act. After all, that statute applies to only one industry. Those provisions are now the subject of court procedure. Their constitutionality has been questioned. We thought that probably we had better wait and see what happened, in any event, even though we are in favor of prohibiting all feather-bedding practices. However, we did accept one provision which makes

[8] In its report of December 31, 1948, the Joint Committee on Labor-Management Relations, established under § 401 of the Taft-Hartley Act, later reviewed the litigation arising under § 8 (b) (6), including the trial examiner's report in the instant case, and recommended "a continuing study of cases arising under the present featherbedding provision, since there has not been sufficient experience upon which to base intelligent amendments at this time." S. Rep. No. 986, Pt. 3, 80th Cong., 2d Sess. 61, and see pp. 58–61.

See also, Hartley, Our New National Labor Policy (1948), p. xiii (Taft), 174, 182–183 (Hartley).

it an unlawful-labor practice for a union to accept money for people who do not work. That seemed to be a fairly clear case, easy to determine, and we accepted that additional unfair labor practice on the part of unions, which was not in the Senate bill." 93 Cong. Rec. 6441. See also, his supplementary analysis inserted in the Record June 12, 1947. 93 Cong. Rec. 6859.

As indicated above, the Taft-Hartley bill, H. R. 3020, when it passed the House, April 17, 1947, contained in §§ 2 (17) and 12 (a)(3)(B) an explicit condemnation of featherbedding. Its definition of featherbedding was based upon that in the Lea Act. For example, it condemned practices which required an employer to employ "persons in excess of the number of employees reasonably required by such employer to perform actual services," as well as practices which required an employer to pay "for services . . . which are not to be performed." [9]

[9] H. R. 3020 as it passed the House provided that:
"Sec. 2. When used in this Act—

"(17) The term 'featherbedding practice' means a practice which has as its purpose or effect requiring an employer—

"(A) to employ or agree to employ any person or persons in excess of the number of employees reasonably required by such employer to perform actual services; or

"(B) to pay or give or agree to pay or give any money or other thing of value in lieu of employing, or on account of failure to employ, any person or persons, in connection with the conduct of the business of an employer, in excess of the number of employees reasonably required by such employer to perform actual services; or

"(C) to pay or agree to pay more than once for services performed; or

"(D) to pay or give or agree to pay or give any money or other thing of value for services, in connection with the conduct of a business, which are not to be performed; or

"(E) to pay or agree to pay any tax or exaction for the privilege of, or on account of, producing, preparing, manufacturing, selling,

The substitution of the present § 8 (b)(6) for that definition compels the conclusion that § 8 (b)(6) means what the court below has said it means. The Act now limits its condemnation to instances where a labor organization or its agents exact pay from an employer in return for services not performed or not to be performed. Thus, where work is done by an employee, with the employer's consent, a labor organization's demand that the employee be compensated for time spent in doing the disputed work does not become an unfair labor practice. The transaction simply does not fall within the kind of featherbedding defined in the statute. In the absence of proof to the contrary, the employee's compensation reflects his entire relationship with his employer.

We do not have here a situation comparable to that mentioned by Senator Taft as an illustration of the type of featherbedding which he would consider an unfair labor practice within the meaning of § 8 (b)(6). June 5, 1947, in a colloquy on the floor of the Senate he said in reference to § 8 (b)(6):

> "[I]t seems to me that it is perfectly clear what is intended. It is intended to make it an unfair labor

buying, renting, operating, using, or maintaining any article, machine, equipment, or materials; or to accede to or impose any restriction upon the production, preparation, manufacture, sale, purchase, rental, operation, use, or maintenance of the same, if such restriction is for the purpose of preventing or limiting the use of such article, machine, equipment, or materials.

.　　　.　　　.　　　.　　　.

"Sec. 12. (a) The following activities, when affecting commerce, shall be unlawful concerted activities:

.　　　.　　　.　　　.　　　.

"(3) Calling, authorizing, engaging in, or assisting—

.　　　.　　　.　　　.　　　.

"(B) any strike or other concerted interference with an employer's operations, an object of which is to compel an employer to accede to featherbedding practices; . . . ." 1. Legislative History of the Labor Management Relations Act, 1947, 160, 170–171, 204, 205.

practice for a man to say, 'You must have 10 musicians, and if you insist that there is room for only 6, you must pay for the other 4 anyway.' That is in the nature of an exaction from the employer for services which he does not want, does not need, and is not even willing to accept." 93 Cong. Rec. 6446.

In that illustration the service for which pay was to be exacted was not performed and was not to be performed by anyone.[10] The last sentence of the above quotation must be read in that context. There was no room for more than six musicians and there was no suggestion that the excluded four did anything or were to do anything for their pay. Section 8 (b)(6) leaves to collective bargaining the determination of what, if any, work, including bona fide "made work," shall be included as compensable services and what rate of compensation shall be paid for it.

Accordingly, the judgment of the Court of Appeals sustaining dismissal of the complaint, insofar as it was based upon § 8 (b)(6), is

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

I fail to see how the reproduction of advertising matter which is never used by a newspaper but which indeed is set up only to be thrown away is a service performed for the newspaper. The practice of "setting bogus" is old and deeply engrained in trade union practice. But so

---

[10] Section 8 (b)(6) does not relate to union requests for, or insistence upon, such types of payments as employees' wages during lunch, rest, waiting or vacation periods; payments for service on relief squads; or payments for reporting for duty to determine whether work is to be done. Such practices are recognized to be incidental to the employee's general employment and are given consideration in fixing the rate of pay for it. They are not in the nature of exactions of pay for something not performed or not to be performed. See 93 Cong. Rec. 6859.

are other types of "featherbedding." Congress, to be sure, did not outlaw all "featherbedding" by the Taft-Hartley Act. That Act leaves unaffected the situation where two men are employed to do one man's work. It also, in my view, leaves unaffected the situation presented in *Labor Board* v. *Gamble Enterprises, Inc., post,* p. 117.

MR. JUSTICE JACKSON labels the services tendered in that case as "useless and unwanted work." Certainly it was "unwanted" by the employer—as much unwanted as putting on two men to do one man's work. But there is no basis for saying that those services were "useless." They were to be performed in the theatres, providing music to the audiences. The *Gamble Enterprises* case is not one where the employer was forced to hire musicians who were not used. They were to be used in the theatrical program offered the public. Perhaps the entertainment would be better without them. But to conclude with MR. JUSTICE JACKSON that it would be better would be to rush in where Congress did not want to tread. For Senator Taft reported from Conference that "The Senate conferees, while not approving of feather-bedding practices, felt that it was impracticable to give to a board or a court the power to say that so many men are all right, and so many men are too many." 93 Cong. Rec. 6441.

But the situation in this case is to me quite different. Here the typesetters, while setting the "bogus," are making no contribution whatsoever to the enterprise. Their "work" is not only unwanted, it is indeed wholly useless. It does not add directly or indirectly to the publication of the newspaper nor to its contents. It does not even add an "unwanted" page or paragraph. In no sense that I can conceive is it a "service" to the employer. To be sure, the employer has agreed to pay for it. But the agreement was under compulsion. The statute does not

draw the distinction MR. JUSTICE JACKSON tenders. No matter how time-honored the practice, it should be struck down if it is not a service performed for an employer.

The outlawry of this practice under § 8 (b)(6) of the Taft-Hartley Act might be so disruptive of established practices as to be against the public interest. But the place to obtain relief against the new oppression is in the Congress, not here.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE joins, dissenting.

Today's decision twists the law by the tail. If the employees had received pay for staying home, conserving their energies and the publisher's materiel, the Court concedes, as it must, that § 8 (b)(6) of the National Labor Relations Act would squarely apply. Yet in the Court's view these printers' peculiar "services" snatch the transaction from the reach of the law. Those "services," no more and no less, consist of setting "bogus" type, then proofread and reset for corrections, only to be immediately discarded and never used. Instead, this type is consigned as waste to a "hell box" which feeds the "melting pot"; that, in turn, oozes fresh lead then molded into "pigs" which retravel the same Sisyphean journey. The Court thus holds that an "anti-featherbedding" statute designed to hit wasteful labor practices in fact sanctions additional waste in futile use of labor, lead, machines, proofreading, "hell-boxing," etc. Anomalously, the more wasteful the practice the less effectual the statute is.

Section 8 (b)(6) declares it an unfair labor practice for a labor organization or its agents *"to cause or attempt to cause* an employer to pay or deliver or agree to pay or deliver any money or other thing of value, *in the nature of an exaction,* for *services* which are not performed or

not to be performed."[1]  But "to cause or attempt
to cause" can refer equally to the ordinary give-and-take
of the collective bargaining process or the unleashing of
the ultimate weapons in a union's armory.  Likewise, "in
the nature of an exaction" may imply that a union's pay
demands must be tantamount to extortion to bring § 8
(b)(6) into play; on the other hand, the phrase may
merely describe payments "for services which are not per-
formed or not to be performed."  Again, "services" may
designate employees' conduct ranging from shadowboxing
on or off the plant to productive effort deemed beneficial
to the employer in his judgment alone.

The Court solves these complex interpretive problems
by simply scrapping the statute.  A broadside finding
that "bogus" is "work," making analysis of all other stat-
utory criteria superfluous, automatically takes the case
out of § 8 (b)(6).  And the printers' doing solely that
which then must be undone passes for "work."  An
imaginative labor organization need not strain far to in-
vent such "work."  With that lethal definition to stifle
§ 8 (b)(6), this Court's first decision on "featherbedding"
may well be the last.

Concededly, § 8 (b)(6) was not designed to ban every
make-work device ingenuity could spawn.  Senator Taft,
the prime exponent of the section as ultimately enacted,
advised that general "featherbedding" legislation be held
in abeyance pending this Court's decision in *United States
v. Petrillo.*[2]  Meanwhile, however, § 8 (b)(6) aimed to
catch practices by which unions "accept money for people

[1] 29 U. S. C. (Supp. V) § 158 (b)(6).  (Emphasis added.)

[2] 332 U. S. 1 (1947).  See 93 Cong. Rec. 6441, 6443.  In the
*Petrillo* case we upheld, against claims including unconstitutional
vagueness, the provisions of the Lea Act, 47 U. S. C. § 506,
which banned various "featherbedding" practices plaguing broadcast
licensees.

who do not work." [3]  He considered it a "perfectly clear" violation of the section "for a man to say, 'You must have 10 [employees], and if you insist that there is room for only 6, you must pay for the other 4 anyway.' " [4]  But surely this cannot imply that six must pack the plant to overflow so that "the other 4" must stay home before § 8 (b)(6) may apply. That quaint notion befogs the draftsmen's clear intent that § 8 (b)(6) strike at union pay demands "for services which [the employer] does not want, does not need, and is not even willing to accept." [5]

Accordingly, we would read the statute's test of "services" as more than a hollow phrase.  Recognizing the administrative difficulties in deciding how many employees are too many for a particular job, Congress perhaps spared the National Labor Relations Board from that.[6] But the Board should certainly not need efficiency engineers to determine that printers setting "bogus" indulge in frivolous make-work exercise.  An interpretation of "services" in § 8 (b)(6) to exclude contrived and patently useless job operations not to the employer's benefit could effectuate the legislative purpose. Cf. *Tennessee Coal, Iron & R. Co.* v. *Muscoda Local,* 321 U. S. 590, 598–599 (1944); *Jewell Ridge Coal Corp.* v. *Local No. 6167,* 325 U. S. 161, 165–166 (1945); *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U. S. 680, 691–693 (1946). And the Labor Board should not so modestly disclaim its oft-recognized expertise which assures full qualifications for administering this task.

It may well be that union featherbedding practices reflect no more than labor's fears of unstable employment

---

[3] 93 Cong. Rec. 6441.

[4] 93 Cong. Rec. 6446.

[5] *Ibid.*

[6] See 93 Cong. Rec. 6441, 6443.

and sensitivity to displacement by technological change. But in a full-employment economy Congress may have deemed this form of union security an unjustifiable drain on the national manpower pool. In any event, that judgment was for the legislature. Under our system of separation of powers the Court ought not so blithely mangle the congressional effort.