LOCAL 282, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUF-FEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

J. J. WHITE READY-MIX CONCRETE CORP., Respondent.

Nos. 109, 110, Dockets 28815, 28847.

United States Court of Appeals Second Circuit.

Argued Oct. 22, 1964.

Decided Dec. 23, 1964.

Herbert A. Levy and Cohen & Weiss, New York City (Stanley M. Berman, New York City, of counsel), for petitioner Local 282.

Allison W. Brown, Jr., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert G. Sewell, Atty., Washington, D. C., for National Labor Relations Board.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

■■ We have here a petition by a union, whose unfair labor practice charge against an employer led to the issuance of a complaint, for review of a consent order entered without hearing over its objection, and a petition by the Board for enforcement against the employer. The basic issue is the Board's power to make a settlement over the objection of the charging person without an evidentiary hearing of some sort. The issue is not determined—we do not intimate the Board suggests it should be—by the undoubted truth that informal disposition is the "lifeblood of the administrative process," Attorney General's Committee on Administrative Procedure, Final Report, 35 (1941), as it also is in civil litigation, or by statistics showing that nearly 75% of all dispositions of unfair labor practice cases otherwise than by dismissal or withdrawal of the charge were by settlement. 28 NLRB Ann.Rep. 170–171 (1963). For the question remains whether this desirable result can be achieved on the consent of the agency responsible for administering the law and the person accused of violating it, as in proceedings before the Federal Trade Commission, or whether a person whose charge was indispensable to initiation of the prosecution and who would have benefited from its success must also consent or be given an evidentiary hearing of some sort. The two other courts of appeals that have considered the issue have divided, with the Third Circuit favoring the petitioner's position, Marine Engineers' Beneficial Ass'n v. NLRB, 202 F.2d 546, cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953), and the District of Columbia Circuit taking the Board's, Textile Workers Union of America v. NLRB, 111 U.S.App.D.C. 109, 294 F.2d 738 (1961), enforced after remand, 114 U.S.App.D.C. 295, 315 F.2d 41 (1963). We likewise sustain the Board.

On July 2, 1963, Local 282, International Brotherhood of Teamsters, filed a charge with the Board's Second Region. It alleged that J. J. White Ready-Mix Concrete Corp. had refused to bargain despite evidence that Local 282 represented a majority of the employees, had discharged one employee and threatened to discharge others for union activities. In response the union began an unfair labor practice strike. Some two weeks later Ready-Mix recognized the union

and announced willingness to bargain, and the employees offered to return to work. For the next week, there was much backing and filling over the rehiring of the strikers, this ending, according to the union, in Ready-Mix' taking back less than all, while retaining several replacements. Some of the employees then resumed the strike. On September 30, the Regional Director issued a complaint against Ready-Mix, alleging unfair labor practices both before and after the first strike, and noticed a hearing for November 12.

On November 8, the Director telegraphed the union's attorneys that the hearing had been indefinitely postponed. Shortly thereafter he entered into a stipulation with Ready-Mix wherein, without admitting the unfair labor practices alleged in the complaint, Ready-Mix agreed to an order requiring it to cease and desist from improperly discouraging union membership, and to make whole the employee initially discharged and those who had not been rehired immediately after the offer to return to work for all wages lost up to the date in late July when employment had been made available. The union's attorneys declined to agree to the stipulation, which they considered inadequate because it did not provide reinstatement and back pay for workers engaged in the second strike. On December 16, the Regional Director sent the attorneys a revised page for the stipulation, reciting that the complaint had been amended so as to delete the allegation that the second strike was provoked by unfair labor practices. After further written objection by the union attorneys to the Regional Director, the Board, taking note of the objections, entered an order dated March 12, 1964, approving the stipulation.

The union thereupon petitioned this court for review. On the Board's statement that it wished "to reconsider its decision in this case and to issue a Supplemental Decision and Order setting forth in detail the basis for its approval of the Settlement Stipulation," we extended its time to file the record. The Supplemental Decision and Order, dated May 19, 1964, recited the considerations that had led the Board to approve the settlement —notably that the Regional Director had "concluded that the Respondent had satisfactorily reinstated the strikers to the employment opportunities that they enjoyed prior to the strike," the replacements retaining only non-unit jobs, and that the second strike "was in fact divorced from the Respondent's earlier unfair labor practices and was actually directed at furthering the Union's economic bargaining demands * * *."

Although the union complains of lack of adequate opportunity to present its objections to the Board, the record leaves no doubt that in the period between the settlement and the Board's decision, the union had ample chance to and did present its views. Its real complaint is that the Board did not conduct a hearing at which the union could show the improvidence of the settlement.

█ The only person to whom the National Labor Relations Act expressly grants the right to a hearing in an unfair labor practice case is the person charged, § 10(b). It is true that the same section provides that "in the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony," and we read the Board's Rules and Regulations, § 102.8, 29 C.F.R. § 102.8 (1964), as making the person filing the charge a party without need for seeking intervention.[1] But although the procedural status thus accorded may allow the charging party to participate in any hearing held, it does not purport to create an independent entitlement to a hearing; that question must turn on what rights, if any, the Act confers upon him.

1. See John L. Clemmcy Co., 118 N.L.R.B. 599, 600 n. 1 (1957); Bakery Drivers Local No. 276, 100 N.L.R.B. 1092, 1095 (1952) (intermediate report); International Bhd. of Boilermakers, 95 N.L.R.B. 1191, 1192 n. 1 (1951).

The question whether the National Labor Relations Act gave private rights to the victims of unfair labor practices was authoritatively answered in the negative by Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940), only five years after the Act was passed. The Supreme Court there held that a union could not apply to a court of appeals to have an employer judged in contempt of a decree enforcing a Board order which had found the employer guilty of unfair practices toward the union. After reviewing the scheme of the Act and its legislative history— notably the declaration of the House Committee, H.R.Rep.No. 972, 74th Cong. 1st Sess. 21 (1935), "No private right of action is contemplated," and the analogies drawn by the committees of both houses to the Federal Trade Commission Act, § 5, see 309 U.S. at 268, 60 S.Ct. at 564—a unanimous Court, speaking through Chief Justice Hughes, said that in unfair labor practice cases the National Labor Relations Board acts "on behalf of the public" and "seeks enforcement as a public agent, not to give effect to a 'private administrative remedy,'" and sharply distinguished the position of persons filing charges with the Board from that of complainants as to matters arising under the Interstate Commerce Act and the Railway Labor Act.[2]

The Board, or since 1947 the General Counsel, § 3(d), thus is *dominus litis*; the General Counsel has power to decide whether to issue a complaint, Lincourt v. NLRB, 170 F.2d 306 (1 Cir. 1948), and to determine what its legal theory should be, Piasecki Aircraft Corp.

v. NLRB, 280 F.2d 575, 588 (3 Cir. 1960), cert. denied, International Union United Auto, etc. v. NLRB, 364 U.S. 912, 81 S.Ct. 276, 5 L.Ed.2d 226 (1960); 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961).[3] His statutory authority "in respect of the prosecution of such complaints before the Board" must include the power to determine whether a complaint can be successfully prosecuted and, if he thinks not, to drop it; by the same token he has power to consider and decide whether the public interest would be better served by settlement, although if the settlement calls for an order, the Board, like a court presented with a consent decree, is not required to enter it. The policy of the Act, as construed in Amalgamated Util. Workers, requires that the Board be recognized as empowered to determine when the possibly slight merit of a charge is outweighed by the sure and speedy concessions, the industrial harmony restored, and the saving of Board resources which a settlement can achieve.

The union gains no support from the point that when the case has been carried to a decision on the merits by the Board, the charging party has standing as a "person aggrieved" under § 10(f) to seek review of an order granting inadequate relief or denying it altogether. American Newspaper Publishers Ass'n v. NLRB, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953). The General Counsel cannot appeal from his own Board's decision, the respondent has no motive to do so, and this portion of the statute would thus be rendered nugatory unless the charging party were recognized as a "person aggrieved." When he acts under this section he is vindicat-

2. The decision is criticized in Jaffe, The Public Right Dogma in Labor Board Cases, 59 Harv.L.Rev. 720, 727–28 (1946), and in 3 Davis, Administrative Law Treatise 273–75 (1958), which, however, concedes that it is "deeply embedded." See, e.g., Stewart Die Casting Corp. v. NLRB, 132 F.2d 801 (7 Cir. 1942).

3. It might be possible to dispose of this case on the basis that the order represents a complete victory with respect to the complaint with the amendment which the General Counsel had power to make, and that the union is thus not a "person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought" within § 10(f). But we prefer not to rest decision on that ground.

ing not a private but the public right. See FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 476–477, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); 3 Davis, Administrative Law Treatise 276 (1958).

The union urges that however the case might be if the National Labor Relations Act stood alone, the Administrative Procedure Act demands decision in its favor. Section 5 of that Act, 5 U.S.C. § 1004, provides, so far as here material, that "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, * * *

"(b) *Procedure.* The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment * * * and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 7 and 8."

This means, says the union, that once a proceeding is initiated as to which someone is entitled to a hearing, the hearing must go on unless all concerned consent to some other determination.

█ The union's argument does not take adequate account of just what Congress said in the statute on which it relies. Section 5(b) does not refer to all the "persons entitled to notice of an agency hearing" mentioned in § 5(a) or to all persons who may be entitled to review as "adversely affected or aggrieved * * * within the meaning of any relevant statute," § 10(a); it refers only to "interested parties." In this context "interest" means a legally recognized private interest and not simply a possible pecuniary benefit resulting from an agency's enforcement of a public right.

█ The distinction admittedly is easier to state than to apply. Parties

have been held to be "interested" with respect to a proceeding called for by a regulatory act not only when they have the kind of interest that would have been recognized at common law, such as a right of protection against overcharges by a carrier, but even when they had no right to complain before the statute was passed and the statutory test is the public convenience and necessity. See Western Pac. Cal. R. R. v. Southern Pac. Co., 284 U.S. 47, 52 S.Ct. 56, 76 L.Ed. 160 (1931). Cf. Chicago Junction Case, 264 U.S. 258, 266–269, 44 S.Ct. 317, 68 L.Ed. 667 (1924); Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382, 52 S. Ct. 440, 76 L.Ed. 808 (1932); Alton R. R. v. United States, 315 U.S. 15, 18–20, 62 S.Ct. 432, 86 L.Ed. 586 (1942). While a competing carrier is thus "a party in interest" entitled to enjoin unauthorized operation under § 1(20) of the Interstate Commerce Act, neither a city engaged in constructing public market facilities nor the private operators of the market have standing under the same statute to enjoin allegedly unlawful construction of a railroad to serve a competing market, L. Singer & Sons v. Union Pac. R. R., 311 U.S. 295, 61 S.Ct. 254, 85 L.Ed. 198 (1940). Whatever may be thought of the particular lines drawn by the decision and dicta in Singer in the context of § 1(20) of the Interstate Commerce Act, see 3 Davis, Administrative Law Treatise 263–265 (1956), its plain thrust is that, where reliance is placed on a legislatively created interest, a person can make the requisite showing (as distinguished from the lesser one required to be a "'person aggrieved") only if the statute can fairly be construed as vesting him with a new private right.

Section 5(b) would thus return us to the same considerations already discussed. Amalgamated Util. Workers and other decisions heretofore cited show that the National Labor Relations Act banned unfair labor practices in order to vindicate a public interest and did not create private rights in the charging party, the recognition of which on some occa-

sions would seriously thwart this public interest. The very argument here being considered shows how serious the conflict could be, since if § 5(b) of the APA in fact applied, the charging party would seem entitled to exact an evidentiary hearing not merely on the reasonableness of a settlement but on the final merits of the charge itself—a complete veto on the public interest in compromise.

 Beyond this, we do not believe that in formulating § 5(b) of the APA, Congress was in any way focusing on the issue of who is entitled to a hearing. Although a literal reading might indicate that Congress was making a .general redefinition of that subject, the statutory history gives firm reason for belief that such a reading would misconceive the purpose. The basic legislative history of the APA is collected in S.Doc. No. 248, 79th Cong. 2d Sess. (1946), containing the Senate print of the act with explanations, House and Senate hearings, the report of the House committee and excerpts from the Congressional Record. Every reference to § 5(b) discovered in this collection indicates that its purpose was simply to insist that informal means of settlement be made available, and not at all to broaden the category of those entitled to demand a hearing—an issue left for determination under the relevant substantive statutes. See, e. g., id. at 23–24, 203, 261–262, 360–61. Section 5(b) was a response to the stress placed on informal resolution of disputes by the Final Report of the Attorney General's Committee on Administrative Procedure 35–43 (1941). Advising agencies on the demands of the new law, the Attorney General's Manual on the Administrative Procedure Act 47–50 (1947) ascribed only that purpose to it. The reference to a hearing in § 5(b) (2) ought thus be read as a cross-reference to §§ 7 and 8 and not as a vague and drastic substantive reform.

The union's petition to review is denied; the Board's petition for enforcement—which is unopposed—is granted.