**CARGO CARRIERS, INCORPORATED,**
Appellant,

v.

**RICHMOND STEEL COMPANY, Incorporated, Appellee.**

No. 7743.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 7, 1958.

Decided Feb. 20, 1959.

Thomas B. Gay and H. Merrill Pasco, Richmond, Va. (Calvin J. Anderson, John F. McGrory, Minneapolis, Minn., Robert P. Buford, Jr., and Hunton, Williams, Gay, Moore & Powell, Richmond, Va., on brief), for appellant.

George R. Humrickhouse and Robert N. Pollard, Jr., Richmond, Va. (Fielding L. Williams and Williams, Mullen, Pollard & Rogers, Richmond, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BOREMAN, District Judge.

HAYNSWORTH, Circuit Judge.

In this action for damages for breach of a contract to construct steel barges, tried to the court without a jury, the District Judge concluded that the contract had been rescinded by mutual consent.

There is no great disagreement among the parties as to what was done and said, the issue being whether or not all of the facts and circumstances warrant the inferences drawn and the conclusion reached by the District Court. We think they do not.

Cargo Carriers, Inc. operates a fleet of barges from points in the upper Mississippi Valley eastward through the Great Lakes to the Eastern Seaboard and southward through the Mississippi and its tributaries to ports on the Gulf of Mexico. Being in need of additional barges, in 1955 it solicited proposals from a number of shipyards. Among those received was one from Richmond Steel Company, which, after some modification during further negotiations, resulted in an agreement that Richmond Steel would construct two steel "river barges" for $77,850 each and six "coastwise barges" for $84,850 each, deliveries to commence late in January 1956 and to be completed approximately three months later. The agreement of October 13, 1955 was confirmed by a "contract letter" from Richmond Steel to Cargo Carriers dated October 18, 1955 and accepted by Cargo Carriers on October 20, 1955.

During the negotiations which culminated in the contract, representatives of Cargo Carriers referred to the then current scarcity of steel plate for barges and pressed Houck, Richmond Steel's sales manager, for assurance that the proposed delivery schedule could be met. Houck assured them that it would be met. He asserted that Richmond had steel on hand to begin construction of the barges and explained Richmond's supposed ability to obtain steel barge plates, when other yards were encountering difficulty, by reference to the fact that Richmond not only operated a shipyard but was engaged in the business of steel warehousing and in fabricating structural steel and ornamental iron.

The great confidence exhibited by Houck on October 13 deteriorated to seeming hopelessness on October 28. On the latter date he called Hays, president of Cargo Carriers, and informed him that, after contacting his suppliers, he had been unable to obtain assurance of timely steel deliveries and would be unable to meet the contract's delivery schedule.[1] Hays responded that he could not wait and would look elsewhere, but would call Houck on the following Monday, October 31, 1955.[2]

1. The urgency of Cargo Carriers' need for the barges had been forcefully communicated to Houck.

2. Houck's version of this conversation is contained in the following testimony:

"A. I made a call to Mr. Hays on October 28. I informed Mr. Hays of our trip to the mills in an effort to get firsthand information as to when we would get the steel and told him that we were unable to get a promise one way or the other; we were not in a position to tell him when we were going to get the steel. I told him that it was one of the hardest things I had ever had to do, to call him and tell him that we would not be able to meet the delivery date as scheduled, because we had worked hard, obtaining the order. I further told him, in accordance with the meeting that morning, that we would not hold Cargo Carriers for any changes or obligation to us.

"Mr. Hays, of course, was disappointed also and wanted to know when we would be able to tell him whether or not we could get the steel, and I again told him what the mills had told us—anywhere from two to three or four weeks that they might be able to tell us when we would get some steel. Mr. Hays' reply was, he was sorry but he could not wait and that he would have to go elsewhere. His exact remark was just that and he added to that, 'But I will call you Monday,' and there the conversation ended.

"Q. Did you or Mr. Hays, either, say anything about a cancellation of the contract? A. No, sir.

"Q. What were your words to him regarding release? A. I told him that we had spent a considerable amount of money, we had made two trips to Minneapolis, we had designed two or three barges, and we had by that time practically detailed the barge, we had the mill orders prepared, and that our management had told me to inform him that we would not hold him—we would release him to do anything that he saw fit.

"Q. And he told you that he would look elsewhere? A. That's right. He

Though Houck tried unsuccessfully to reach Hays by telephone on November 2, there was no further conversation between the parties until November 4 when Hays called Houck.[3] During this conversation, Hays reported a fruitless search for another shipyard which could promise a delivery schedule approaching his need, and Houck said his steel situation remained unchanged and he did not know when he could construct the barges. Houck suggested that Hays accept a proposal of another shipyard which, according to Hays, would undertake to construct the barges for delivery in June.

After talking to Hays on November 4, Houck wrote to him:

"November 4, 1955.
"Cargo Carriers, Inc.
Grain Exchange Building
Minneapolis, Minnesota

Attention: Mr. F. J. Hays, President.

"Dear Mr. Hays:

"This will confirm the writer's conversation with you on Friday, October the 28th, 1955 and today, November 4, 1955. On Friday, October the 28th, the Richmond Steel Company called you to inform you that the plate situation had changed almost overnight, and that the mills would not live up to the promises which they made to us several weeks before. Our vice president, Mr. Charles Williams and myself, made a trip the week of October the 23rd and personally visited all of our plate suppliers and returned to Richmond on Friday, October the 28th. Our findings were that we could get no promise at all for steel plate in time to complete your order, as we had scheduled. We notified you of this in our telephone conversation on Friday, October the 28th and it was agreed at that time that you could not wait for us to give a delivery date, and that you

would see about placing the order elsewhere, and that you would contact us on Monday, October the 31st.

"We explained to you that we had spent a considerable amount of time and money on this order, but in view of the fact that we knew you wanted your barges in the early spring of next year, and that we found that we were not in a position to make this delivery, we felt that the right thing to do was to notify you rather than delay your program. When we did not hear from you on Monday, we assumed that you had placed the order elsewhere, however, according to your conversation today you have not placed the order with another supplier.

"We appreciate your kindness and sincerely regret that we are unable, at this time to give you any delivery promises close to your requirements. As explained to you again today, we have made a thorough investigation of the steel plate situation with all of our plate suppliers, the supply situation could not be worse and it does not appear to us that it will improve. Under these circumstances you can readily see that we can make no delivery promise, and knowing your desire for delivery early next year we can only say that such a delivery would be impossible. Such being the situation and realizing your need for prompt delivery we would be willing, as we have already stated, to relieve you of any obligation so that you may make other arrangements. We regret very much that the supply situation prevents our giving the delivery desired, however, if the situation should improve we will contact you at that time. Thanking you again, for the courtesies extended we remain,

"Very truly yours,

Richmond Steel Company, Inc.
J. R. Houck, Sales Manager."

said he could not wait for us to find out when we could get the steel and he would have to go elsewhere."

3. Hays testified that he had tried unsuccessfully to reach Houck by telephone on November 2nd or 3rd, and that Houck placed the call of November 4th. It was for the District Judge to resolve the conflicts in the testimony, however, and we must construe the testimony most favorably to Richmond Steel.

Though he was then uninformed of Richmond Steel's Trap Rock contract, [4] upon receipt of Houck's letter of November 4, Hays became suspicious that Richmond Steel's difficulty might be want of potential profit in performance of the contract rather than want of steel. In an effort to discover whether Richmond Steel was honestly representing its steel supply situation, he sent to Richmond a Captain Wright, who was Cargo's marine superintendent. By telephone to Houck, Wright arranged a meeting in Richmond on November 11th. At that meeting Houck told Wright the contract had been terminated, this being the first occasion a word of such import had been used. Wright, nevertheless, persisted in his inquiry into the situation and, ignorant of the Trap Rock contract, became convinced that Richmond Steel was having difficulty obtaining steel and would be happy to proceed with the contract if it could procure steel plates. Wright thus suggested the possible use of "warehouse steel," and Houck estimated that the use of such steel would add some $4000 to the cost of each barge. Called on the telephone by Wright, Hays was interested in the suggestion and instructed Wright to inform Richmond Steel's representatives that they might have one week to investigate the supply of warehouse steel and to submit a proposal for a price increase based upon the higher cost of the material.

When informed by Wright that Richmond Steel claimed Hays had canceled the order, Hays denied that he had done so, and wrote to Houck on November 15th that he was sorry there had been some misunderstanding, but he had never intended to cancel unless he could find another shipyard which could better Richmond Steel's performance. He expressed the hope that, on the basis of the conversations in Richmond on the 11th, the eight barges might be constructed for delivery in accordance with the original schedule. On November 18th, however, Houck wrote to Hays that he had investigated the steel market at the warehouses and at the mills, and that he could not "accept an order on any basis, with delivery as you originally indicated you needed."

The letters of November 15th and 18th are set forth in the margin.[5]

4. New York Trap Rock Corporation had solicited bids for the construction of fifteen steel scows. It required that bids be received in New York not later than noon on November 1, 1955. Richmond Steel submitted a proposal to construct all fifteen scows for delivery by April 30, 1956. A formal contract for construction by Richmond Steel of the fifteen Trap Rock scows was executed on November 3, 1955, but the price and the delivery schedule of the bid were modified. Under the formal contract, Richmond Steel was to deliver five scows by April 30, 1956, an additional five by June 30, 1956 and the remaining five by August 30, 1956 for a total price of $847,500. Richmond Steel explains its willingness to enter into the Trap Rock contract at the very time it was telling Hays it could not secure steel by pointing to the later delivery dates in the formal Trap Rock contract and the provision of that contract for a modest penalty for delayed delivery of $26 per day per scow, which was in lieu of all other damages. Indeed, Houck testified the Trap Rock price was loaded with a substantial sum to take care of prospective loss under the penalty clause.

5. "November 15, 1955 "Richmond Steel Company, Inc. P. O. Box 1578 Richmond 13, Virginia Attention: Mr. J. R. Houck, Sales Manager.
"Gentlemen:
"Since Captain Wright has called on you, we felt quite hopeful that you will be able to work out something to build at least eight barges for us with delivery as originally agreed. We are sorry that there was any misunderstanding at all as we did not intend to withdraw the order from you unless and until we were able to arrange with some other shipyard to do better than you were apparently able to do. Now that it looks possible for the thing to be worked out again, we are enclosing a letter which we wrote to you earlier but which was not sent to you because of receipt of your letter which made the deal sound hopeless.
"Incidentally, we have word from another shipyard this morning that U. S. Steel has now started to give out first

If Houck's statements to Hays on October 28, 1955 may be regarded as an offer to rescind the contract—doubtless, they would be if Hays had treated them as such and had accepted the offer—it was also notification of inability to perform and an anticipatory breach of the contract.[6] Only in the light of the compound nature of the communication may Hays' response and his subsequent conduct be judged, for the communication presented Cargo with unwelcome alternatives and created remedial rights which Cargo was entitled to exercise. What Hays did was entirely consistent with the continuance and preservation of those rights.

His immediate response that he could not wait indefinitely for Richmond to obtain some very uncertain delivery of steel plate and would look elsewhere is the natural reaction of the wronged and disappointed contractor. An affable and forgiving shopper, confident that comparable bargains awaited his inquiry, might have uttered the same words, but the evidence conclusively demonstrates that Hays had carefully investigated the capacities of shipyards before awarding the contract to Richmond and had no reason to hope that some other shipyard might better in performance Richmond's contractual obligations. Frustrated in his dependence upon Richmond's promised deliveries and prices, his reinvestigation of the possible performance of other shipyards was his right and entirely consistent with an intention to hold Richmond Steel responsible for whatever loss the default of Richmond Steel imposed upon Cargo Carriers. Any more pointed expression of the preservation of his rights would have appeared unnecessarily contentious and litigious.

quarter 1956 steel. They have not yet started to give out plates, but this shipyard expects that they will within a day or two. You will no doubt know much more about this than we do.

     "Yours very truly,
     F. J. Hays."

     "November 18, 1955
"Cargo Carriers, Inc.
300 Grain Exchange
Minneapolis 15, Minn.
Attention: Mr. F. J. Hays,
    President
"Dear Mr. Hays:

"We appreciate very much your kindness in allowing us another week from last Friday to explore the steel situation further and try to come up with some kind of delivery on the eight barges being discussed at an increased price and extended delivery.

"In accordance with Captain Wright's instructions we have this past week explored very thoroughly the steel market both on a mill basis and on a warehouse basis. The situation is such that it would be impossible for us to accept an order on any basis, with delivery as you originally indicated you needed. Because of the current short supply of steel the only possible way that we could accept your order would be with delivery based on receipt of steel from the mills and with an escalator clause.

"Your letter of November 15, 1955 indicates that you received word from another shipyard that U. S. Steel had started to give out first quarter alotments. (sic) We have heard nothing of their accepting first quarter orders on plates, however, we have been informed by U. S. Steel that there will be no steel for January or February of next year, so that the first quarter will consist of March only.

"Again we want to thank you for your kindness in trying to work something out so that you may give us an order. However, we feel that under the circumstances knowing your delivery requirements, that we would be doing you an injustice to promise any delivery at this time.

"Again we wish to state that if and when the situation loosens up we will contact you immediately.

     "Very truly yours,
     Richmond Steel Company, Inc.
     J. R. Houck, Sales Manager."

6. Richmond also set up other defenses, claiming, upon several grounds, legal excuse for its nonperformance. Those defenses do not bear upon the issue of rescission and are disregarded in the resolution of the one question presently before us. Whatever the likelihood that Richmond may ultimately prevail upon the basis of such defenses, it is not so obviously probable as to make unreasonable an assumption by Hays that Richmond was firmly and continually obligated to perform.

■ Assent to the rescission of a contract is not dependent upon the employment of particular words, but may be manifested by diverse means, and conduct may import more than words suggest. One suddenly confronted with his contractor's repudiation of the contract, except in very unusual circumstances, need not immediately object, however, at the peril of loss of all of his rights, and subsequent conduct gives rise to no inference of assent to rescission unless it is substantially inconsistent with an insistence upon the continuation of the contractual obligations. Restatement of Contracts § 406, Comment b.; 6 Williston on Contracts 5170, § 1826; 17 C.J. S. Contracts § 389, p. 881; Tuso v. Green, 194 Cal. 574, 229 P. 327; Allardice v. McCain, 375 Pa. 528, 101 A.2d 385; Van Keulen v. Sealander, 183 Wash. 634, 49 P.2d 19.

Hays' report to Houck on November 4th that he had been unable to find another shipyard which could promise deliveries approaching Richmond's obligation, or at comparable prices, is indicative of continued reliance upon the contract. If the contract was rescinded in the conversation of October 28th there was no reason for Hays to report back to Houck the results of his reinvestigation, and Houck's anxiety to hear from Hays on October 31st, just before Richmond's Trap Rock bid was to become final, suggests that Houck had much more than an idle curiosity about Cargo Carrier's success in finding a satisfactory substitute supplier. Nor could Houck with reason have supposed that Hays intentionally would release fixed rights in the uncertain hope that he might find comparable performance by an unobligated shipyard in the face of the then clearly established scarcity of steel plate. On the contrary, the conversation of October 28th was clearly indeterminate, and Houck expectantly awaited a telephone call from Hays on October 31st.

Indeed, Houck's statements of November 4th were that, "when we did not hear from you on Monday, we assumed that you had placed the order elsewhere * * *." Such statements, coupled with his efforts to reach Hays on the telephone on November 2nd, strongly suggest that Houck, himself, had no idea on those dates that Richmond had been released from all of its contractual obligations on October 28th. Indeed in his letter of November 4th he spoke, in the future tense, of Richmond's willingness to release Cargo Carriers from any liability, clearly nonexistent, for reimbursement for Richmond Steel's preliminary engineering, and like, expense. Houck testified that, over that weekend, he continued to search for steel for the Cargo Carrier barges, a fact strongly indicating a sense of continuing obligation which is not satisfactorily explained away by his statement that he sought merely to please a concern which, despite Richmond's default, he regarded as a potential customer in the future.

■ Richmond Steel, on October 28th, was in no position to deliver ultimata to Cargo Carriers. If, as we must now assume, Houck was really motivated by the shortage of steel plate rather than by the enticement of the pending Trap Rock contract, he could propose rescission to Hays, but he could not limit Cargo Carriers' investigation of its alternatives or require that silence at the end of the weekend be construed as acceptance of the offer of rescission. An offerer may condition the continuance of his offer upon acceptance within a specified time, but, without the clear assent of the offeree or some duty, under the circumstances, to respond, he may not arbitrarily insist upon affirmative rejection within a limited, perhaps unreasonable, period. This is particularly so when the offer itself is equivocal, and one who defaults in the performance of his contractual obligations may not impose his own arbitrary conditions upon the pursuit by the promisee of his remedies.

■ Richmond Steel finds significance in the fact that on October 28th Hays had written a letter to Richmond Steel concerned with details of the construction of the barges, but, upon receipt of Houck's telephone call, the letter was

withheld from the mail. This is the letter which subsequently was forwarded as an enclosure of Hays' letter of November 15th. The engineering detail contained in Hays' letter of October 28th was useful to Richmond Steel only if Richmond Steel was going to perform its contract. When Hays was informed by Houck on October 28th that Richmond Steel could not construct the barges, communication of additional structural detail was wholly futile. Withholding such information on October 28th and subsequently forwarding it on November 15th implies no more than that Hays, on October 28th, believed Houck's representation that Richmond could not obtain steel with which to perform the contract while, on November 15th, he was hopeful that, through the use of warehouse steel, Richmond could, and would, construct the barges. There is nothing in the dictation and delayed mailing of this letter which tends, in the least, to suggest that Hays intended to release Richmond Steel from its contractual obligations.

Finally Richmond searches for some inconsistency between Cargo's position that the contract was not rescinded and Hays' willingness to consider a modified proposal that Richmond would construct the barges of warehouse or preformed steel at a somewhat higher price but for delivery as originally scheduled. Had such a proposal been made and accepted, Richmond says, it would have been a new contract, which leads Richmond to the conclusion that the original contract was effectively terminated by agreement, though the suggested modified proposal was neither made nor accepted. Had the parties agreed that Richmond would construct the barges of warehouse steel and deliver them in accordance with the original schedule and that Cargo would pay an increased price, a new valid contract might have been effected, provided a sufficient consideration could be found in Richmond's new promise of performance to support Cargo's promise of larger payments.[7] But if a new agreement, supported by consideration, would effect a rescission of the earlier agreement, a mere willingness to consider a new proposal is not evidence of a previously accomplished rescission of the original agreement. At most, it suggests a conditional assent to rescission provided the new agreement is consummated.

When Richmond sought escape from its contractual obligations, Cargo was not foreclosed by any rule of law from offers of additional inducement to achieve Richmond's prompt compliance. Clearly, Cargo's primary interest was in the delivery of completed barges at the times provided in the original schedule, and if it preferred to have the completed barges than a lawsuit for damages, there was no reason it could not discuss its primary objective without waiver of its legal rights. Enforcement of a right to damages for nonperformance and acceptance of substantial performance may be inconsistent, but an effort by a promisee to secure performance is not ordinarily an election of remedies and is not indicative of an intention to release the right to damages if the effort to obtain performance is unavailing. In short, the inconsistency Richmond ascribes to the conduct of Hays is illusory, and what Hays did does not warrant the inference that he intentionally relinquished the remedial rights of Cargo Carriers. All that can be said is that he preferred performance to damages, and he did not lose the right to the latter when he failed to obtain the former.

All that Hays said and did was consistent with the preservation of Cargo's rights under the original contract. His statements and his conduct, in our opinion, do not support the inference that he assented unconditionally to a rescission of the contract or that he intentionally released Cargo's valuable contractual rights.

Since the District Court had no occasion to pass upon the remaining defenses

7. Williston on Contracts §§ 130, 1826.

set up by Richmond or upon the damages, if any are to be awarded, we do not reach those other issues. We conclude only that the defense of rescission is not established on this record.

Reversed and remanded.