F. W. MEANS & COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 15647.

United States Court of Appeals Seventh Circuit.

May 8, 1967.

John H. Bishop, Chicago, Ill., Lawrence T. Zimmerman, Washington, D. C., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before KNOCH, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

F. W. Means & Company petitions this court to review and set aside the

Board's order finding that the Company refused to bargain in good faith in violation of sections 8(a) (5) and (1). The Board cross-petitions for enforcement of the order. We deny enforcement.

The Company operated its Sample Street store in South Bend, Indiana, under collective bargaining agreements with the Union[1] since 1960. The Union was challenged by a competing union in a representation election, but the Company's employees chose to retain the existing Union, and on May 7, 1964, it was certified as bargaining agent. Thereafter the Union requested negotiation with the Company for a new contract to supplant the agreement due to expire June 13, 1964.

The parties met on June 3, and subsequently on July 8 the Company made an offer containing three alternative wage proposals and all other contract terms previously agreed upon. The next day the members of the Union chose one of the offers and this wage scale was put into effect, retroactive to June 13, 1964. On July 20, with two minor reservations, the parties approved the wording of a written draft prepared by the Union. Attorneys Philbin (for the Union) and Falasz (for the Company) orally agreed upon the wording of the two remaining points on July 22. Philbin then prepared a draft to incorporate these changes. To this draft he also added clauses concerning union security and dues check-off, neither of which had been discussed previously.[2]

About July 31, fifteen copies of this draft, signed by Union Representative Klass, were submitted to the Company. Falasz called Philbin to inquire about the changes. He objected to them but offered to substitute the language of the previous informal agreements. When Philbin said no and commented that "we have not finalized these matters," Falasz asked him to contact the Union and call

him back. Philbin left for a vacation on August 4 without doing so, and Regional Union Attorney Lampert took his place.

Lampert learned that the Company had entered into a better contract with the Teamsters Union, which represented employees at the Company's Beyer Street store. This prompted Lampert, on August 18, to write requesting return of the fifteen copies of the agreement. The Examiner credited Lampert's version of a telephone conversation on August 20 in which Falasz asked the reason for the Union's request to return the agreements. Lampert testified that he said it was because of the Company's inaction on the contract proposals, that Falasz said the Company had objected to the new clauses which had not been negotiated, and that Falasz then asked what the Union would give in exchange for inclusion of the clauses. When Lampert said the clauses were not bargainable, Falasz said, "if that were the case * * * we would have to start negotiations all over again," and requested a letter from Lampert "in that respect."

On August 21, Lampert wrote Falasz that "in view of the fact that [his] client refuse[d] to sign," Lampert requested return of the agreements and resumption of negotiations on "the unresolved issues." He wrote again, on August 26, "officially withdrawing said agreement." On the same date the Company signed the agreements and sent them to Falasz. On August 27 Falasz sent them to Lampert.

On September 11 the Union rejected the signed contract as representing an agreement "clearly and unequivocally" revoked, and renewed its request for resumption of negotiations of "unresolved issues." This letter stated that the proposed agreement had been induced by an "unequivocal" promise that the terms

---

1. Local 319, Amalgamated Clothing Workers of America, AFL-CIO.

2. It appears from the record that Union dues were checked off during July and August, as they had been under a previous informal agreement.

offered the Teamsters Union at the Company's other South Bend store on Beyer Avenue would not be better than those offered the Union for the Sample Street store, and that the Company had broken the promise. Falasz, relying upon the bargaining agreement as concluded July 8, 1964, answered that the agreement reached was in full force and effect. On October 7 the Union struck the Company. The Company wired the Union that the strike violated the bargaining agreement and that employees who failed to return to work October 8 would be assumed to have quit. The Union wired back that it was engaging in an "unfair labor practice strike because of [the Company's] bad faith refusal to bargain."

The Union decided to continue the strike until negotiations were resumed. On March 8, 1965, it wired respondent demanding immediate negotiation and threatening the filing of charges with the Board. On March 12 charges were filed. The complaint was filed May 19. On May 26 the Union repeated its demand, but the Company stood upon the agreement. The positions of the Union and the Company remained unchanged when the hearing began July 12, 1965. The Company asserted a defense under section 8(d), claiming that a binding contract was made on July 22.

The Board expressly rejected the Examiner's view that the oral agreement of July 22 was unenforceable because it had not been reduced to writing acceptable to both parties. But the Board found it unnecessary to decide whether the parties made a binding agreement on July 22, 1964, because it thought that events after July 22 indicated that "such agreement as they may have reached" on that date was "mutually rescinded."

The main issue here is whether the record as a whole substantially supports the Board's finding that the parties by their conduct rescinded whatever agreement was made July 22, 1964.

The Board did not decide whether the Union and Company had made an agreement but assumed they had and inferred from their subsequent conduct a mutual intention to rescind. The basis of the Board's finding of rescission is the failure of the Company to demand a written draft of the prior oral agreement and to rely on a binding agreement to reject the new clauses submitted in the written draft, the Company's willingness to bargain over the new clauses, and the Company's statement that if the Union insisted on the new clauses, negotiations would have to start all over again.

Had the Board passed upon the question whether a contract existed, there would be a better light in which to examine the question of rescission. As the record is, the Board apparently assumed that if an agreement existed on July 22 it was not formally expressed, since the Board's rescission decision rests upon a most informal base.

 It is true that "technical rules of contracts" do not necessarily control all decisions in labor-management cases. Lozano Enterprises v. NLRB, 327 F.2d 814 (9th Cir. 1964). But the court there noted that "the normal rules of offer and acceptance" are generally determinative of the existence of a bargaining agreement.

 In the case before us we think the underlying purpose of the Act, industrial peace, called for the application of rules calculated to afford some degree of certainty in collective bargaining. We think it is clear that the Board deviated from general principles of contracts law in finding an agreement to rescind, and we hold that it was not justified in doing so in the circumstances of this case.

 The Company's failure to object to the addition of the new clauses in the written drafts on the ground of an existing binding agreement was no evidence of an intention to rescind the entire agreement. Its conduct was not "substantially inconsistent with an insistence upon the continuation of contractual obligations" previously accepted. Cargo Carriers, Inc. v. Richmond Steel Co., 263 F.2d 919, 924 (4th Cir. 1959). It was only after the Company had signed the

written drafts already signed by the Union that it received notice in Lampert's letter of August 26 that the Union wanted to rescind the entire agreement. Until then, the Union's position was at best unclear as to whether something more than modification regarding two issues was under discussion. And these two issues were already the subject of informal agreements between the Company and the Union.

■■ With respect to the failure of the Company to insist upon a written draft conforming to the agreement of July 22, it suffices to say that the absence of such a demand is not inconsistent with industrial peace where the differences between the written drafts and the previous agreement were, in our view, minimal. We are not prepared to say that a failure to insist upon one's rights, American Newspaper Publishers Ass'n v. NLRB, 193 F.2d 782 (7th Cir. 1951), cert. denied in part, 344 U.S. 816, 73 S. Ct. 11, 97 L.Ed. 635 (1952), aff'd in part, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953), is evidence of an abandonment of them, particularly where they have not fully ripened and differences can be settled short of litigation.

Negotiations between the parties prior to the telephone conversation of August 20 related solely to modification of the agreement of July 22.[3] Their only relevance to the issue before us is to aid in interpreting the meaning of events on and after August 20.

■ The Board focused particularly upon two statements made by Falasz in the telephone conversation of August 20. First, according to Lampert, Falasz asked him what the Union would be willing to exchange for the addition of the two new causes. We think this question in the light of previous discussions amounted to no more than mere negotiation, calculated to resolve the situation amicably. It could not have raised a reasonable expectation on the part of Lampert that the Company was willing to repudiate the entire contract and that he could bind the Company to rescission by his reply.

■ Falasz's second statement to which the Board directed its attention was in reply to Lampert's assertion that the new clauses were not bargainable: "[I]f that were the case * * * we would have to start negotiations all over again." According to Lampert, Falasz added that if that were the case, Lampert should submit a letter to that effect. We do not think Lampert could have reasonably expected that an affirmative reply on his part could have effected a contract to rescind. Lampert's own version of the statement characterized it as tentative. And his replies, both on the telephone and in his letter of August 21, revealed that he in fact did not regard Falasz' remarks as an offer to rescind the entire contract. Apart from general contracts principles, we think industrial peace would not be served if this conversation were held to rescind a collective bargaining agreement reached after several weeks of negotiation.

■ The record before the Board fully raised the issue of a binding agreement as well as that of rescission. In passing over this issue, several important functions of findings of fact by administrative tribunals were overlooked by the Board. It should have set forth its views on all of the issues raised to insure that it had considered all of the evidence and its proper relation to the issues of whether there was a contract existing and whether it had been rescinded.

■ Where the Board disagrees with the Trial Examiner's fundamental view of a case—as it did here—we think the Board should set forth its view of the law and findings of fact fully, in order to afford the reviewing court the advantage of the Board's expertise and to assure uniformity in the application of the

---

3. Even Lampert's letter of August 18, asking return of the written drafts, could not have resulted in a reasonable expecta-tion by Falasz that the Union was offering to rescind the entire agreement.

Act. See 2 DAVIS, ADMINISTRATIVE LAW § 16.05 (1958).

For the reasons given, we hold that the record considered as a whole does not give substantial support to the Board's decision and order. The order will not be enforced.

Enforcement denied.