## CAPITAL SERVICE, Inc. et al. v. NATIONAL LABOR RELATIONS BOARD.

### No. 13416.

United States Court of Appeals
Ninth Circuit.

Jan. 30, 1953.

As Amended on Rehearing May 12, 1953.

---

3. See Note 2.

Hill, Farrer & Burrill, Hyman Smith, Los Angeles, Cal., for appellants.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Charles K. Hackler, Chief Law Officer, 21st Region, N.L.R.B., Los Angeles, Cal., Norton J. Come and Duane Beeson, Attys., N.L.R.B., Washington, D.C., for respondent.

Stevenson & Richman, Los Angeles, Cal., Todd & Todd, San Francisco, Cal., for Bakery Drivers Local Union No. 276, amicus curiae.

Before DENMAN, Chief Judge, and ORR and POPE, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal by Brashears and Capital Service, Inc., hereafter Service, manufacturers of bakery products in non-union plants, and selling them to retail dealers merchandising such products in and around Los Angeles, California. The appeal is from a preliminary injunction of the district court [1] granted on the complaint of the National Labor Relations Board, hereafter called the Board, enjoining Service from "Enforcing or seeking to enforce or in any other manner giving continued effect to or availing themselves of the benefits of, the preliminary injunction issued on April 7, 1952, by the Superior Court of California, Los Angeles County, in Case No. 595892; and from taking or applying for any further proceedings in said Superior Court the effect of which would be to enjoin or restrain the defendant labor organizations in Superior Court Case No. 595892 from engaging in peaceful picketing or other concerted activities affecting the customers of Capital Service, Inc., and their suppliers, and which are carried on pursuant to a labor dispute with Capital Service, Inc."

Service had filed a charge with the Regional Director of the Board alleging the acts of the unions hereafter described and the Board has issued a complaint against the unions. The purpose of the preliminary injunction sought for the granted below is to hold the situation in the status quo until the Board determines whether it will consider Service's charge.

The complaint below for a preliminary injunction alleges a cause under Section 8(b) (4) (A) of the Act, 29 U.S.C.A. § 158 (b) (4) (A); and describes the conduct of the labor unions in picketing the stores in which the goods manufactured by Service's employees were sold, hereafter considered, and states as a conclusion of law that the picketing and other activities of this labor organization at the retail stores, insofar as it was limited to acquainting ultimate consumers with defendant's non-union working conditions, was not an unfair labor practice.

As will be seen, the acts alleged and proved show that the unions did much more than acquaint the ultimate consumers

1. 28 U.S.C. § 1292(1).

of the goods manufactured by Service's employees of the latter's non-union status. They urged a boycott by the public of the employee-manufactured goods and successfully persuaded the retail sellers to cease selling such goods.

The Board assumes that the successful boycott of the goods manufactured by Service's employees, thus to a large extent restraining them from such manufacture and tending to coerce them to abandon their non-union status, is not an unfair labor practice within Section 7 of the Act, 29 U.S.C.A. § 157. It nevertheless contends that the Act pre-empts to the federal government this field of consumer boycott to the exclusion of any rights of the states to regulate in that field.

We find it unnecessary to consider this contention of the Board since we regard the Board as having the power to consider the instant consumer boycott and on the facts hereafter shown to issue its cease and desist order, if in its discretion, it determines so to act.

A. *Jurisdiction by effect on interstate commerce.*

 The reduction by the consumers' boycott and other acts of the unions of the amount of goods manufactured by Service's employees necessarily reduces substantially the amount of materials used in such manufacture. The findings of fact by the court below show that during 1951 Service made purchases totaling approximately $500,000. Of this amount, $30,000 was received directly from sources outside California and $175,000 was received indirectly from such sources. See Wickard v. Filburn, infra, on indirect effect on interstate commerce. Thus, if Service were to be put out of business, approximately $205,000 worth of goods would cease flowing in interstate commerce. This is a substantial amount and not so slight as to bring into play the maxim of *de minimis.* See N. L. R. B. v. Fainblatt, 306 U.S. 601, 606, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S.

453, 467, 58 S.Ct. 656, 82 L.Ed. 954; N. L. R. B. v. Townsend, 9 Cir., 185 F.2d 378, 383.

Nor does it matter that Service is essentially a local business, supplying bakery goods for stores in the Los Angeles area. In Wickard v. Filburn, 317 U.S. 111, 124–125, 63 S.Ct. 82, 89, 87 L.Ed. 122, the Court stated:

"But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'"

Thus it is the factor of substantial economic effect upon interstate commerce and not the nature of the business that determines federal jurisdiction. As has been shown, there is such substantial economic effect effect present here. See N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 683–685, 71 S.Ct. 943, 95 L.Ed. 1284.

B. *The boycott of the product of Service's bakers to restrain their opposition to and to compel their unionization is prohibited by Section 8(b) (1) of the Taft-Hartley Act.*

 One of the labor unions is the Bakery and Confectionery Workers International Union of America, Local No. 37, hereafter called the Bakery Union. This union is seeking to force the workers in Service's bakery manufacturing to join the Bakery Union. In this effort it was joined by a union organization, the Los Angeles Food Council and the Los Angeles Central Labor Council.

Their method of enforcing their demand for unionization of the Service's bakery workers was to persuade the public not to buy the products manufactured by Service's bakers by a secondary boycott of the sale of these products by retail food stores to which they were sold by Service. They established picket lines at the retail customers'

entrances of the stores displaying placards stating:

"To The Public
Danish Maid
Bakery Products
Sold Here Are Made
And Delivered By
A Bakery That Is
Non - Union
And On The
We Do Not Patronize List
Of The
Los Angeles Central Labor Council
Los Angeles Food Council
Joint Council Of Teamsters' Union 42
Bakery Drivers' Local 276
Bakers' Local Number 37"

Against this the Superior Court in a suit brought by Service made its preliminary injunction enjoining all the unions from:

"1. Inducing or seeking or attempting to induce any person to refrain from purchasing plaintiff's merchandise by picketing plaintiff's customers or prospective customers."

We think Congress has pre-empted this function to the National Labor Relations Board and that the state court is without jurisdiction to issue such an injunction. Such a boycott to enforce unionization is prohibited by the Taft-Hartley Act, Section 8(b) (1) (A).

■ The pertinent portions of that Section are: (b) (1) "It shall be an unfair labor practice for a labor organization * * * to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this title."

The rights guaranteed by Section 7 as they were in the Wagner Act are:

"Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in

other concerted activities for the purpose of collective bargaining or other mutual aid or protection".

To these the Taft-Hartley Act significantly added the following right of employees:

"* * * and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a) (3) of this title."

The language of 8(b) (1) (A) prohibiting restraint and coercion by a labor organization is the same in this regard as Section 8(a) (1) providing for an EMPLOYER, that (a) "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title".

The Supreme Court has held of Section 8(a) (1) of the Wagner Act, which is the same as in the Taft-Hartley Act, that the test whether the employer has violated the "restrain" provision is whether "the words or deeds * * * taken in their setting, were reasonably likely to have restrained the employees' choice and [whether] the employer may fairly be said to have been responsible for them * * *." N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 366, 85 L.Ed. 368.[2]

It is inconceivable that the Taft-Hartley Act intended the identical words "restrain or coerce" of 8(a) (1) and 8(b) (1) to have a different meaning when applied to a labor organization from that when applied to an employer. As stated by Senator Taft,

"The act for years has contained the provision:

"It shall be an unfair labor practice on the part of an employer—

"To interfere with, restrain, or coerce employees in the exercise of the rights to work and organize.

2. Similarly, in N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 447, 62 S.Ct. 344, 86 L.Ed. 348; N.L.R.B. v. Ford, 6 Cir., 170 F.2d 735, 738; N.L.R.B.

v. Bird Machine Co., 1 Cir., 161 F.2d 589, 590; N.L.R.B. v. Winona Textile Mills, 8 Cir., 160 F.2d 201, 206.

*"All that is attempted is to apply the same provision with exact equality to labor unions."* (Emphasis supplied.) Legislative History of Labor Management Relations Act, 1947, Vol. 2, 1207.

That the Board has sometimes, in enforcement cases, overlooked the possibilities of § 8(b) (1) (A) is suggested by what was said in National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, at page 672, 71 S.Ct. 961, 95 L.Ed. 1284. The Board should be vigilant to see that what was sauce for the goose under the Wagner Act is now sauce for the gander under the Taft-Hartley Act.[3]

Nothing could more strongly restrain Service's employees from retaining their non-union status or coerce them into joining the Bakery Union than stopping or making intermittent their employment by picketing with appeals to persuade the public to boycott the products of their work. The evidence shows that all of the picketed stores did cease to sell the products manufactured by Service's employees. Here is more than an appeal to the *employees* to persuade *their* action. Here is successful economic coercion tending to prevent them from exercising their right to work, by diminishing the public consumption of the product of their work.

Such economic coercion is that stated by Senator Taft in summing up the bill to the Senate on May 2, 1947. "The effect of the pending amendment is that the Board may call the union before them, exactly as it has called the employer, and say, 'Here are the rules of the game. You must cease and desist from *coercing and restraining* the employees who want to work from going to work and earning the money which they are entitled to earn.' The Board may say, 'You can persuade *them* [that is, the employees not the public]; you can put up signs; you can conduct any form of propaganda you want to in order to persuade *them,* but you cannot, by threat of force or *threat of economic reprisal,* prevent them from exercising their right to work.' As I see it, that is the effect of the amendment."[4] (Emphasis supplied.) Legislative History of the Labor Management Relations Act, 1947, Vol. 2, p. 1206.

As stated by Senator Ball:

"* * * Basically, the primary objective of the majority of jurisdictional strikes and secondary boycotts *is not the employer,* but the *employees* over whom control is sought." (Emphasis ours.) Cong.Record, Senate, May 12, 1947; Leg.Hist. of the LMRA, Vol. 2, p. 1497.

And again:

"* * * The employees are the primary objective and the primary victims for secondary boycotts and jurisdictional strikes." Cong.Record, Senate, May 9, 1947; Leg.Hist. of the LMRA, Vol. 2, p. 1350.

■ There is no merit to the contention that because the House receded from a provision *specifically* covering such secondary boycotts, Congress intended them to be made legal for all purposes. We may assume the House knew of the Supreme Court and other decisions cited above on the words restrain and coerce in 8(a) (1) and 8(b) (1), and that under 8(b) (1) boycotts are not legal where, as here used to restrain or coerce employees.

*C. The unions' attempt to deprive Service of its sale of its products to the retail stores by persuading its wagon drivers to cease delivering its bakery products to such stores.*

■ This preliminary injunction of the district court restrained Service from avail-

---

**3.** As stated by Judge Learned Hand in N.L.R.B. v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 130 F.2d 503, 506.

**4.** The Senator apparently had changed his mind since a prior statement:

"Question: Suppose the union, instead of refusing to handle his goods in other plants which that union has organized, urges the general public not to buy products of non-union manufacturers?

"Answer: That is not forbidden by the act, since it is merely persuasion."

He had not then recognized that urging the public not to buy employee-made goods was not mere persuasion of employees but the threat of economic reprisal on the employees, by diminishing their employment through diminished public buying.

ing itself of the following provision of the preliminary injunction of the Superior Court reading:

"2. Stationing or maintaining any pickets at or about the place of business of any of plaintiff's customers or prospective customers or threatening to do same."

One of the unions involved is Bakery Drivers Local Union No. 276, a branch of the American Federation of Labor, hereafter the Drivers Union. It was seeking a concerted refusal by the Service's delivery drivers from transporting Service's bakery products to the retail stores and likewise the retail stores' delivery wagons from delivering the bakery products to the retail customers. In this the Bakery Drivers Union was aided by the same unions as in the attempted boycott of the goods produced by Service's bakers.

Here the picket line was maintained at the rear entrances of the retail stores where the bakery products were handled in and out of the stores. They displayed the same placards to the drivers of the delivery wagons as those displayed to the public at the retail customers' entrances. We agree with the Board that such conduct violated Section 8(b) (4) (A) of the Taft-Hartley Act providing:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person [not an employee] to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *." (Emphasis supplied.)

This section of the Act, unlike 8(b) (1), makes it an unfair labor practice to induce the employees of an employer to engage in "concerted refusal in the course of their employment" to prevent any person from dealing in the goods of any *other* person. Here the Drivers Union is seeking to prevent the retail stores from buying Service's products. Such union encouragement of Service's drivers to make a "concerted refusal in the course of their employment" respecting the handling of its products is entirely different in character from persuading the individual public buyers entering the stores to boycott such goods to force a unionization of Service's bakery manufacturing employees.

D. *The question then arises whether, since both these acts of picketing are in violation of the Taft-Hartley Act, the state courts are excluded from attempting to enjoin such acts where prohibited by the State or federal law?*

We think that the control by the federal tribunals is exclusive. 29 U.S.C.A. § 160 (a) of the original Act provided: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce. This power *shall be exclusive, and* shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise." (Emphasis supplied.)

As amended by the Taft-Hartley Act, these two sentences remain save that the words "shall be exclusive, and" are stricken, and the states given power of enforcement by agreement with the board in certain cases by adding the following proviso after the word "otherwise": *"Provided,* That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of

this subchapter or has received a construction inconsistent therewith."

We construe this amendment as giving to a state a right of enforcement only by an agreement reached by it with the board. Here there was no such agreement.

The order for the preliminary injunction is affirmed.

POPE, Circuit Judge (concurring).

I think especially important the statement in Judge Denman's opinion that "The purpose of the preliminary injunction sought for and granted below is to hold the situation in the status quo until the Board determines whether it will consider Service's charge." In adding this special concurrence I want to state that I think there is a most difficult question lurking in the background of this case and which it should be understood I, for one, do not now decide. Suppose that hereafter the Board should decide, as we have held it has a right to do, Haleston Drug Stores v. National Labor Relations Board, 9 Cir., 187 F.2d 418, that Capital Service's operations were so essentially local that their interruption would not have the requisite effect on commerce.[1] If that time came it is possible that we might find difficulty in discovering any intention of Congress to the effect that where the Board thus exercises its uncontrolled discretion to leave a controversy and a business alone, State action is prohibited. See Missouri Pacific Ry. Co. v. Larabee Flour Mills Co., 211 U.S. 612, 623, 29 S.Ct. 214, 53 L.Ed. 352; Kelly v. Washington, 302 U.S. 1, 12, 58 S.Ct. 87, 82 L.Ed. 3.

1. Similar abstentions by the Board, in respect to an entire industry, have been recognized as within the Board's power.

National Labor Relations Board v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, 144.