NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED RUBBER, CORK, LINOLEUM
AND PLASTIC WORKERS OF AMER-
ICA, AFL–CIO, and its Local 511, Re-
spondents.

No. 7781.

United States Court of Appeals
Fourth Circuit.

Argued March 9, 1959.

Decided June 26, 1959.

Sobeloff, Chief Judge, dissented.

Duane B. Beeson, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

James O. Cross and Garnet L. Patterson, Akron, Ohio (Arthur J. Goldberg, Washington, D. C., on the brief), for respondents.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

The question in this case is whether a labor union was guilty of unfair labor practices in violation of § 8(b)(1)(A) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq., when it picketed the plant of an employer and conducted a boycott campaign in order to force the employer to recognize the Union as the bargaining representative of its employees in spite of the fact that the Union had been rejected by the employees in a Labor Board-conducted representative election. The Board concluded, upon the facts hereinafter stated, that the Union had violated § 8(b)(1)(A) of the Act by restraining and coercing the employees in the exercise of rights guaranteed by § 7 of the Act by picketing the Company for the purpose of obtaining recognition and a contract as the exclusive representative of the Company's employees, when the Union did not represent a majority of the employees. The Board issued an order directing the Union to cease and desist from such activities and also from conducting a boycott campaign against the Company's products for the purpose of forcing the Company to recognize the Union as the exclusive representative of the employees, or of forcing the Company to enter into a contract with the Union when it did not represent a majority of the Company's employees.

The O'Sullivan Rubber Corporation is engaged in the manufacture and sale of rubber soles and heels at Winchester, Virginia. From 1942 to 1946, its production and maintenance employees were represented by Rubber Workers Local 22770, affiliated with AFL. On March 20, 1956, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO, petitioned the Board for an election, which was held by consent on April 4, 1956, and resulted in a vote of 343 votes for and 2 against the petitioner out of a total of 388 eligible voters. Accordingly, on April 12, 1956, the Board certified the Union as the exclusive representative of the workers and shortly thereafter Local Union No. 511 was chartered to service the employees. Contract negotiations were then carried on from April 1956 until May 11, 1956, but no agreement was reached. A strike was called on May 14, 1956, and 27 bargaining sessions were held up to April 1, 1957, but no agreement was consummated. Picketing of the plant was begun on May 14, 1956, and has since been carried on continuously and was still in operation at the time of the examiner's hearing two years later.

When the strike began the Company had 420 employees of whom 8 appeared for work and 412 did not. During the next two months 72 additional employees returned to work and the Company hired a total of 265 persons who had never worked for it before, so that on July 16, 1956, the Company had a complement of 345 workers and has since carried on active operations.

On September 26, 1957, as the result of petitions filed by the employer and one of the employees in the previous April, indicating that the employees no longer desired to be represented by the Union, the Board ordered that an election be held and decided that the employees who had gone on strike were economic strikers who had been permanently replaced and were therefore ineligible to vote. On October 18, 1957, the election was held and out of a total of 325 eligible voters, 5 voted for the

Union and 288 voted against it. Accordingly, the Board, on October 28, certified that the majority of the ballots had not been cast for the Union.

From the beginning of the picketing on May 14, 1956, until a month after the election on October 18, 1957, the picketers carried signs which contained the warning that the penalty of strikebreaking was a lifetime of shame and regret, and alleged that the products of the Company were made by strikebreakers and by a company without a soul and urged the public not to buy the Company's products. Thereafter the picketers used signs which stated that the local union had been on strike since May 13, 1956, and that the Company was unfair to organized labor and urged the public not to buy the Company's products made by strikebreakers.

Since October 28, 1957, the picketers at the entrance of the plant have not engaged in any violence or other conduct designed to impede the voluntary ingress and egress of employees or other persons having business with the Company, and they have not been present in such numbers as to accomplish such purposes.

The Personnel Manager of the Company testified that all of the negotiations between the Company and the Union related to attempts to reach a contract and that the Union had not indicated in any manner to the Company that there had been any change in the issues since the negotiations were terminated on April 1, 1957.

On October 16, 1957, on the eve of the election, the Local Union published an advertisement in a Winchester newspaper which appealed to the employees to vote for the Union and stated that the strike and boycott would continue regardless of the outcome of the election until the Company reached an agreement with the Union in a satisfactory settlement of the issues involved in the strike.

A reporter for the newspaper testified that after the results of the election were published he was told by the field representative of the International Union that the strike and boycott would continue although the Union had lost the election, and a statement to this effect was published in the newspaper in the evening of that day and has not been challenged. In November 1957, a leading article appeared in a publication of the Union, known as "The United Rubber Worker," which contained a statement of the General President of the United Rubber Workers that the consumers' strike against the products of the Company was continuing in the struggle of the Local Union for a contract with decent wages and working conditions. A reprint of this article was distributed by the Union to 10,000 shoe repair shops in various states and directed the attention of all shoe men to the fact that the strike and the boycott were still on.

In January 1958, a news story from Atlantic City, where the Constitutional Convention of AFL-CIO was being held, noted the unanimous approval by the delegates of a resolution supporting the Union in its consumer boycott of the Company. The article stated in part that the Union had spearheaded the consumer strike because the Company had stubbornly refused to consider a fair and reasonable contract with the Local Union.

■ On the basis of the foregoing evidence the Board found that the Unions continued to seek a contract with the Company despite the loss of the election on October 18, 1957. The Board therefore held that the Unions, notwithstanding their minority status, continued their economic sanctions of picketing and boycotting in the period after the election for the purpose of compelling the Company to recognize them as the representatives of the employees who had decisively rejected them.

The opposing testimony of the Unions as to their intentions after the election was found unconvincing and insufficient by the Board. Representatives of the Unions testified that their original objective was changed after they lost the election, and that after the result of the election was certified by the Board on October 28, 1957, they ceased to seek recognition as to the bargaining representa-

tive in order to obtain a contract covering the employees and continued their efforts merely to obtain reinstatement for the replaced strikers. The Board rejected this testimony in view of the post-election activities and statements of the Unions above referred to. We are bound by this finding since it is clear that there was substantial evidence on the record as a whole to support it.

The substantial question in this case is whether the exertion of economic pressure by a union upon an employer by picketing and boycotting in order to secure recognition as the bargaining representative of the employees and to secure a contract from the employer after the employees have rejected the union in a Board-conducted election is a violation of § 8(b)(1)(A) of the statute. The first paragraph of § 8(b) declares that it shall be an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of the rights guaranteed by § 7 of the statute, which includes the right to bargain collectively through representatives of their own choosing and also the right to refrain from any or all such activities, that is, to refrain from union representation altogether.

The Board in support of its conclusion that the Unions' conduct was a violation of the statute, quoted a passage from its prior decision in Curtis Bros., 119 NLRB 232, 236, on November 4, 1957, wherein, departing from its earlier decisions in 1948 in National Maritime Union, 78 NLRB 971 and Perry Novell, 80 NLRB 225, it first interpreted the statute to cover minority picketing for recognition. It said, page 236:

"* * * the pressure [exerted by such sanctions] is necessarily an economic one, a device to reduce the business to the point where his financial losses force [the employer] to capitulate to the union's demands. It is immaterial whether the ostensible technique, or the unspoken but necessary consequence is to cut off the employer's labor supply by preventing the employees from reporting to work; to keep the customers from buying his products; or to interrupt deliveries of supplies to the premises. The important fact of the situation is that the Union seeks to cause economic loss to the business during the period that the employer refuses to comply with the union's demands.

"And the employees who choose to continue working, while the union is applying this economic hurt to the employer, cannot escape a share of the damage caused to the business on which their livelihood depends. Damage to the employer during such picketing is a like damage to his employees. That the pressure thus exerted upon the employees—depriving them of the opportunity to work and be paid—is a form of coercion cannot be gainsaid. There is nothing in the statutory language of Section 8(b)(1)(A) which limits the intendment of the words 'restrain or coerce' to direct application of pressure by the Respondent Union [upon] the employees. The diminution of their financial security is not the less damaging because it is achieved indirectly by a preceding curtailment of the employer's interests."

See also the Board's decision in Alloy Mfg. Co., 119 NLRB 307, reversed in part sub nom, N.L.R.B. v. International Ass'n of Machinists, 9 Cir., 263 F.2d 796.

■ We are in accord with the Board's decision. The basic purpose of the National Labor Relations Act of 1935, as shown by the preamble contained in § 1, was to protect the right of employees to organize for the purpose of collective bargaining so that they might have equal bargaining powers with their employers; and in order to accomplish this purpose, it was provided in § 8(a) (1)(A) and § 7 of the Act that it would be an unfair labor practice for an employer to interfere, restrain or coerce employees in their right to bargain collectively and to choose their representatives for this purpose, free from the control of the employer. This statement of

698

the policy of Congress was repeated in the Taft-Hartley Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. In the meantime the right of employees to organize and bargain collectively through unions of their own choice free from interference by their employers had been so firmly established by the decisions of the courts that Congress recognized that the unions, as well as the employers, might intrude upon the rights of employees and therefore the statute should be amended to subject them also to restraint under the administration of the Labor Board. Accordingly, the correlative § 8(b)(1)(A) was enacted to prohibit conduct that amounted to unfair labor practices on the part of union organizations.[1]

■ When the facts found by the Board in the pending case are considered, there can be no doubt that the actions of the Union after the election were designed to coerce the workers to choose the Union as their bargaining representative and thus deny them the right of free choice bestowed upon them by the statute. The Company had lawfully filled the places of the workers who had struck for economic purposes and the new men had rejected the Union by an overwhelming majority in a fair election conducted by the Board. Nevertheless, the strike went on continuously, the new employees were held up to scorn as strikebreakers, and the security of their employment was jeopardized by the appeal to the public to refrain from purchasing the Company's products. This attempt to frustrate the purpose of the Act was the more glaring in that the repudiation of the Union by the workers had been formally established and although the attempt failed, it was none the less an unfair labor practice condemned by the Act.

In Building Service Employees International Union, Local 262, v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, the Supreme Court upheld an injunction issued by a state court against the peaceful picketing by a labor union of an employer to compel him to coerce his employees in their choice of a bargaining representative. The injunction was issued because the activities of the union constituted an attempt to induce a transgression of the state's policy against coercion by an employer. The picketing took place after the employees had voted against joining the union. Recognizing that the picketing by the union was a violation of the state law, the Supreme Court said (339 U.S. at pages 538–539, 70 S.Ct. at page 788):

" * * * Picketing of an employer to compel him to coerce his employees' choice of a bargaining representative is an attempt to induce a transgression of this policy, and the State here restrained the advocates of such transgression from further action with like aim. * * "

This description of the coercive effect of picketing under the circumstances described supports the finding of the Labor Board that the picketing by the Union in the pending case had a similar coercive effect.

It can hardly be denied that the economic pressure exerted in this case upon the employer and through it upon the employees falls literally within the terms of § 8(b)(1)(A); but it is said that this construction of the statute is not tenable since it conflicts with other sections of the law. First, it is pointed out that § 13 declares that, except as specifically provided, nothing in the Act shall be construed to interfere with, impede or diminish in any way the right to strike, and it is contended that picketing as

1. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 484–490, 71 S.Ct. 456, 95 L.Ed. 456. United Automobile, Aircraft & Agr. Implement Workers v. Wisconsin Board, 351 U.S. 266, 272, 76 S.Ct. 794, 100 L.Ed. 1162. The legislative history supports this description of the general purpose which Congress had in mind in enacting the amendment now codified as § 8(b)(1) (A). See Sen.Rep. 105, 80th Cong., 1st Sess., p. 50, 1 Leg.Hist. 456; II Leg.Hist. 1018, 1021, 1028, 1032, 1199, 1203, 1206–07.

well as striking is covered by this section. Reference is made to the decision in N.L.R.B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, where it was held that an attempt, accompanied by acts of violence, by pickets of an uncertified union to influence the driver of a truck of a neutral customer to refrain from going to the picketed plant for goods did not amount to an inducement to the employees of the customer to engage in *concerted* action on their part designed to interfere with the rights of the employees of the picketed plant in violation of § 8(b)(4) of the Act. We do not think that this decision lays down the rule that the right to picket is the same as the right to strike or that coercive measures by a union should be condoned which are designed to interfere with the free choice of employees in the selection of a bargaining representative or in abstaining therefrom. Surely the Supreme Court did not intend to give its approval to the violent acts of the picketers. On the contrary the Court pointed out that to reach the charge of violence the complaint should have been based on § 8(b)(1)(A) which is invoked in the pending case. The order of the Board now under review does not interfere with the Union's right to strike. It is directed against the picketing of a plant after the loss of an election, accompanied by acts of economic pressure to coerce the employees to recognize the Union against their will. Everyone agrees that violent conduct by picketers designed to accomplish this result is forbidden by § 8(b)(1)(A) and the language of the section, when interpreted in view of the purposes of the Act, is broad enough to include all other coercive conduct which the Board finds sufficient to interfere with the independent choice of the employees.

Secondly, it is pointed out that the statute contains specific prohibitions against certain forms of coercive conduct, which would include picketing, and hence it is contended that other conduct, such as that employed by the Union in this case, must be lawful even if it falls within the condemnation of the general terms of § 8(b)(1)(A). One of these prohibitions is contained in § 8(b)(4)(C) of the Act, which amongst other things makes it an unfair labor practice for a labor organization to engage in a strike or to encourage the employees of any employer to engage in a strike in order to force the employer to recognize it as the representative of his employees if another labor organization has been certified by the Labor Board as the representative of the employees under § 9 of the Act.

It is argued that if § 8(b)(1)(A) is given a broad application so as to cover coercive striking and picketing, § 8(b)(4)(C) would become entirely useless because all of the activities therein described would be covered by the former section. This was the view expressed by the Court of Appeals of the District of Columbia in Drivers' Local No. 639 v. N.L.R.B., —— F.2d ——, certiorari granted, 359 U.S. 965, 79 S.Ct. 876, 3 L.Ed.2d 833 in which the court reversed a decision of the Labor Board which held that a union which did not claim to represent a majority of the employees was guilty of an unfair labor practice under § 8(b)(1)(A) when it engaged in the peaceful picketing of a plant where no union had been certified. We do not think that this argument justifies the robbing of § 8(b)(1)(A) of the meaning to which its terms entitle it. The circumstances under which this section was inserted in the Act support the view that it should be given a broad interpretation in order to protect employees from coercive conduct not only of the employer but also of labor organizations. When the statute was first reported out of committee in the Senate it contained § 8(b)(4)(B) and (C) but did not contain § 8(b)(1)(A). Five members of the committee, including Senators Taft and Ball, were of the opinion that the bill was not stringent enough to regulate certain union activities and accordingly sought amendments on the floor which resulted in the addition of the last named section Hence it may fairly be recognized as an

enlargement of the bill originally reported so as to make provision for circumstances not covered by § 8(b)(4)(B) and (C) as originally incorporated therein. See S.Rep. 105, 80th Cong., 1st Sess., pp. 50–56, I Leg.Hist. pp. 456–462; Senate 1126, 80th Cong., 1st Sess., p. 15, I Leg.Hist., p. 113.[2]

The two sections may be distinguished by the fact that different remedies for their enforcement have been provided in the statute. Section 10($l$) provides that whenever it is charged that any person has violated § 8(b)(4)(C) and reasonable ground to support the charge has been found upon preliminary investigation, an application must be made to the appropriate Federal District Court for temporary injunctive relief pending final adjudication by the Board. On the other hand, the right to invoke injunctive relief for violations of § 8(b)(1)(A) is vested in the Board by § 10(j), which empowers the Board in its discretion upon the issuance of a complaint of unfair labor practice to petition the United States District Court for temporary relief or restraining order. In view of the complicated situations which the statute is intended to cover, it seems unreasonable to cripple the remedial provision contained in § 8(b)(1)(A) merely because there is some overlapping of its scope with that of other sections of the statute.

Again, it is contended that the use of the consumer boycott by the Union in this case, whether coercive or not, cannot be regarded as a violation of § 8(b)(1)(A) because § 8(c) of the Act authorizes "the expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal, or force or promise of benefit."[3] Freedom of speech, however, does not furnish a conclusive answer to the problem, for the right of free speech in general does not justify the encouragement or incitement of a breach of law. Fox v. Washington, 236 U.S. 273, 277, 35 S.Ct. 383, 59 L.Ed. 573. Thus it has been held specifically that peaceful picketing is not protected as an exercise of the constitutional right of free speech if

2. The effect to be given to the legislative history of the proceedings of Congress in interpreting § 8(b)(1)(A) has been much in dispute. The majority of the Labor Board expressed the opinion in Drivers Local 639 (Curtis Bros.), 119 NLRB 232, that the legislative history supports their interpretation while the dissenting member and the examiner took the opposite position. References to the proceedings of Congress bearing on the subject are set out in the majority and minority opinions. A similar division of opinion exists between the decision of the court of the Ninth Circuit in Capital Service v. N. L. R. B., 204 F.2d 848, and the decision of the District of Columbia Court in Drivers Local No. 639 v. N. L. R. B., —— F.2d ——. Under these circumstances it is not surprising to find that law writers regard the legislative history as inconclusive. See Bornstein, Organizational Picketing, 46 Ky.L.J. 25, 57–61; Note, 42 Minn.L.R. 459, 473. To some extent those who hold to the narrower interpretation of the section rely upon the postlegislative history contained in the report of the Watchdog Committee of 1949, 80th Cong.S.Rep. 986, Pt. 3, pp. 70–71, which in turn relies on decisions of the Labor Board in 1948 and 1949, which announced a policy that the present Board declines to follow. In United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, the Court disapproved the use of debates after the passage of an act as authoritative guides to its construction. In United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941, references to postlegislative history were referred to in the opinion of the Court. In National Labor Relations Board v. Lion Oil Co., 352 U.S. 282, 291, 77 S.Ct. 330, 1 L.Ed.2d 331, a 1948 report by the Joint Committee on Labor-Management Relations was referred to by the Court but it was expressly stated that it did not constitute a part of the legislative history of the 1947 Act.

3. In N. L. R. B. v. International Ass'n of Machinists, 9 Cir., 263 F.2d 796, 799, it was held that the actions of a union in listing an employer on its "'We Do Not Patronize' list" and in urging others not to do business with him were protected by the First Amendment and did not constitute unfair labor practice.

its object is to violate a state law. In International Brotherhood of Teamsters, Local 695, A.F.L., v. Vogt, Inc., 354 U.S. 284, at page 289, 77 S.Ct. 1166, 1 L.Ed. 2d 1347, where the Court upheld the validity of a state law forbidding peaceful picketing to coerce an employer to put pressure on his employees, contrary to the public policy of the state, to join a union, the Court said that picketing by an organized group is more than a communication of ideas or freedom of speech since the very presence of the picket line may induce action irrespective of the ideas that are being disseminated. Similarly, in International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, it was held, notwithstanding the rights of free expression accorded by § 8(c) of the statute, that it was an unfair labor practice, under § 8(b)(4)(A), for a union to engage in peaceful picketing to induce union employees to strike in order to force a general contractor to terminate his contract with a nonunion subcontractor. The Court said, 341 U.S. at pages 704–705, 71 S.Ct. at page 960:

> "e. The remedial function of § 8 (c) is to protect noncoercive speech by employer and labor organization alike in furtherance of a lawful object. It serves that purpose adequately without extending its protection to speech or picketing in furtherance of unfair labor practices such as are defined in § 8(b)(4). The general terms of § 8(c) appropriately give way to the specific provisions of § 8(b)(4)."

In like manner, § 8(c) should be so interpreted as not to nullify the protection accorded to employees by § 8(b)(1) (A) of the statute.

Whatever may be said as to the coercive force of peaceful picketing for purposes of persuasion and the application thereto of the prohibitions contained in § 8(b)(1)(A) we entertain no doubt that coercion of employees in restraint of the right to an independent choice of a bargaining representative is found in a case like the present where the Union has been decisively rejected in a formal election conducted under the auspices of the Board and yet persists in a continuous and long drawn out strike accompanied by picketing, wherein the employees are described as strikebreakers and appeals to the public not to purchase the products of the employer are made not only by participants in the picket line but also in widespread publications directed to the public generally and specifically to the customers of the employer.

The order of the Board will be enforced.

SOBELOFF, Chief Judge (dissenting).

Whether or not the existing law forbids peaceful picketing or the publication of "We Do Not Patronize" advertisements by a union, after employees in an election have rejected the union without choosing another, is not readily determinable by a mere reading of the statute. As the majority opinion recognizes, the legislative history is also inconclusive, each side to the controversy being able to cite expressions by Senator Taft and others to support its arguments.

According to the administrative interpretation which persisted for nine years, these practices were not forbidden by the Taft-Hartley Act. It was so stated in 1948 by the Labor Board in Perry Norvell, 80 NLRB 225. The "Watchdog Committee" of the Congress, created under Title IV of the Taft-Hartley Act to study its operation and effect, acquiesced in this determination of the Board. The Committee declared that it would be inadvisable until after "further experience" to broaden Sec. 8(b)(4)(C), which makes it an unfair labor practice for a union to picket for recognition after another union has been certified. The Committee did not intimate the opinion that Sec. 8(b)(1)(A) already covered a case like this, and it advised against expanding Sec. 8(b)(4)(C) (the logical place for such a provision) to cover cases where no union has been certified.

While the Supreme Court declared in National Labor Relations Board v. Lion Oil Co., 1957, 352 U.S. 282, 291, 77 S.Ct. 330, 1 L.Ed.2d 331, that the 1948 committee report is no part of the legislative history of the statute enacted in 1947, it nevertheless, in support of its interpretation, noted the views contained in that report. The views expressed in the committee report were again cited in American Newspaper Pub. Ass'n v. National Labor Relations Bd., 1953, 345 U.S. 100, 108 fn. 8, 73 S.Ct. 552, 97 L.Ed. 852.

I find further and even more persuasive evidence in the recent vigorous and extended Senate debate on the Kennedy-Erwin Bill. 105 Cong. Rec. 5951–5978. Both its proponents and opponents seem to have predicated the discussion upon the view that the present law has not proscribed these practices. The tenor of the arguments advanced by Senators who condemned such conduct was that there is a present need to amend the law to make these practices illegal.

The Board argues that the opinion expressed by the "Watchdog Committee" merely reflected the Committee's reading of the Board's Perry Norvell decision; but such an argument cannot dispose of the recent debate in the Senate. For despite the Board's 1957 reversal of its Norvell decision, in Curtis Bros., Inc., 119 NLRB No. 33, and Alloy Mfg. Co., 119 NLRB No. 38, the action of the Senate indicates that the present Act was not considered to prohibit the conduct here involved. At no time in the long debate was it intimated by anyone that what was proposed was merely declaratory of existing law.

This accumulation of opinion among the legislators seems to me significant. In this situation I do not think it is for us to declare the law in accordance with our independent judgment as to what it should be, however persuasive the arguments for such a change.

I fully agree that neither the First Amendment nor Sec. 8(c) protects speech under all circumstances, and assume for present purposes that Congress may in instances like this forbid picketing and even boycotting. Cases in which under similar circumstances the Supreme Court has upheld injunctions were decided under state statutes, and the Supreme Court expressly said that it made no independent construction of the statutes but accepted the interpretation of the State Courts. Building Service Employees, etc. Union v. Gazzam, 1950, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; International Teamsters Union v. Vogt, Inc., 1957, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 44. See also, Pappas v. Stacey, 1955, 151 Me. 36, 116 A.2d 497, appeal dismissed, 350 U.S. 870, 76 S.Ct. 117, 100 L.Ed. 770. These cases answer the contention that such restrictions are unconstitutional; they do not deal with the issue before us, whether by Sec. 8(b) (1) (A) Congress enjoined the conduct here under attack.

I do not attribute to Sec. 8(b) (1) (A) the far-reaching effects claimed for it. It is not too much to require that such a legislative purpose be expressed clearly and unequivocally. The peaceful expression of views should not be condemned by a new administrative interpretation of statutory language which can just as easily be construed, and for a long time was construed, not to require this result.

In Sec. 8(c) Congress has made plain its purpose to protect freedom of speech. Indeed, it would appear that in enacting Sec. 8(c) Congress meant to give assurance that Sec. 8(b) (1) (A) was not to be as sweeping as its language standing alone might suggest. The Court's opinion holds that in the present circumstances Sec. 8(c) must yield to Sec. 8(b) (1) (A), but it seems to me that any derogation of the broad protection of Sec. 8(c) should be expressed in more specific language than is to be found in Sec. 8(b) (1) (A). In International Brotherhood of Electrical Workers v. National Labor Relations Board, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L. Ed. 1299 where Sec. 8(c) was held to be qualified by Sec. 8(b) (4) the Supreme Court was careful to point out that

"[t]he *general* terms of § 8(c) appropriately give way to the *specific* provisions of § 8(b) (4)." (341 U.S. 704–705, 71 S.Ct. 960.) (Emphasis supplied.) Section 8(b) (1) (A) contains no specific language forbidding the conduct that is challenged here, and in this respect significantly differs from Sec. 8(b) (4), which in unmistakable terms condemns certain secondary boycotts and other specifically enumerated acts.

I find the opinion of the Ninth Circuit in N. L. R. B. v. International Ass'n of Machinists, Inc., 263 F.2d 796, very persuasive. In that case, the Court refused to interpret Sec. 8(b) (1) (A) as prohibiting consumer boycotts, while indicating no opinion as to picketing because the point had not been properly reserved below. The Court of Appeals for the District of Columbia Circuit has rejected the Board's present interpretation in respect to picketing. Drivers' Local No. 639 v. N. L. R. B., —— F.2d ——, certiorari granted 359 U.S. 965, 79 S.Ct. 876, 3 L.Ed.2d 833. We are called upon to answer the question of picketing as well as boycott.

The possibility of a distinction between picketing and boycotting has been suggested, that is to say, that picketing may be illegal under the general language of Sec. 8(b) (1) (A), while boycotting, since it falls more directly within the general area of freedom of speech is in a more protected status, at least until Congress attempts more specifically to forbid it. However, the language of Section 8(b) (1) (A) admits of no such distinction, and must be interpreted as directed to both or to neither. Such a grouping presents no problem, for even picketing which the Supreme Court has said is more than mere speech. International Teamsters Union v. Vogt, Inc., 354 U.S. 284, 289, 77 S.Ct. 1166, 1 L. Ed.2d 44, contains elements of speech and communication, and therefore should not lightly be held to have been outlawed.

In dealing with this problem Congress may or may not recognize a difference between a case where the union has never represented the employees and continues to picket after they have rejected it in an election and another case, where, as here, the employees represented by a certified union have gone out on an economic strike and been replaced by a new force of employees who vote the union out in an election based upon a decertification petition. In the latter situation the union may be thought by Congress to have equities which warrant protection. Whether these and other equities which may arise in a particular instance deserve protection, are considerations to be resolved by the legislative branch, not by us. Pending Congressional clarification, I would hold that peaceful picketing and publishing "We Do Not Patronize" advertisements by a minority union, when no other union has been certified, have not been condemned as unfair labor practices within the meaning of Sec. 8(b) (1) (A).